STATE of Missouri, Appellant,

v.

Huber M. WALSH, Respondent.

No. 67465.

Supreme Court of Missouri,
En Banc.

July 15, 1986.

William L. Webster, Atty. Gen., Kevin B. Behrndt, Asst. Atty. Gen. Jefferson City, for appellant.

Richard Cooper, David O. Danis, St. Louis, for respondent.

Arlene Zaremblea, St. Louis, Abby R. Rubenfeld, Lambda Legal Defense and

Educ. Fund, Inc., New York City, Gene P. Schultz, St. Louis, Amicus Curiae.

DONNELLY, Judge.

Respondent, Huber M. Walsh, was charged by information with attempted sexual misconduct, §§ 564.011, 566.090.1(3), RSMo 1978. The information stated that "on or about Wednesday, April 10, 1985 at approximately 10:30 a.m. at Dorsett & Marine Avenue, in the County of St. Louis, State of Missouri, the defendant touched Det. Steven Zielinski's genitalia through his clothing and such conduct was a substantial step toward the commission of the crime of sexual misconduct with Det. Zielinski and was done for the purpose of committing such sexual misconduct."

Prior to trial, respondent moved to dismiss the information upon the sole ground that § 566.090.1(3) denied respondent "equal protection of the law as guaranteed by the Constitution of the United States and the State of Missouri." The trial court granted the motion and dismissed, and the State prosecutes this appeal.

Section 566.090 states in pertinent part:
1. A person commits the crime of sexual misconduct if:

\* \* \* \* \* \*

(3) He has deviate sexual intercourse with another person of the same sex.

Section 566.010 defines "deviate sexual intercourse" as:

[A]ny sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person;

\* \* \* \* \* \*

The Committee Comment to § 566.090 indicates that it was intended to criminalize deviate sexual intercourse "between consenting adults in private." There is no record before us to show whether the conduct charged occurred in the context of a private consensual transaction. Inasmuch as respondent challenges the facial constitutionality of the statute, a fully developed record is unnecessary to our determination of the issues.

The State argues that our inquiry is limited to a consideration of only that ground upon which the trial judge based her dismissal; namely, that § 566.090 deprived respondent of equal protection because "the statute would not be applicable to the defendant if he were a female."

■ Normally, constitutional issues must be raised at the earliest opportunity. *Christiansen v. Fulton State Hospital,* 536 S.W.2d 159, 160 (Mo. banc 1976). In this case, only the equal protection claim was raised before the trial court. On direct appeal to this Court from the summary dismissal, respondent raises the issue of his right to privacy as secured by the new substantive due process. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). The Supreme Court has recognized that classifications involving fundamental rights are reviewable under the equal protection guarantee. *See,* e.g., *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Therefore, by raising the equal protection challenge in the trial court, the right of privacy issue is also properly before the Court.

The issue is whether the Fourteenth Amendment to the United States Constitution prohibits the states from proscribing homosexual conduct. Neither the language of the amendment nor its history indicate that it was intended to prohibit the states from proscribing homosexual conduct. Indeed, resondent makes no such argument.

Rather, respondent and amici essentially argue that § 566.090.1(3) discriminates on the basis of the exercise of a fundamental right to sexual privacy, and is thus a suspect classification under the equal protec-

tion clause. Respondent also contends that § 566.090.1(3) "prohibits member[s] of the same sex from engaging in certain sexual activities. Thus, [a] class distinction is presented because it clearly prohibits males from sexual activity with males and females from sexual activity with females, but allows males to engage in sexual activity with females and [vice versa]."

■ The State concedes that the statute prohibits men from doing what women may do, namely, engage in sexual activity with men. However, the State argues that it likewise prohibits women from doing something which men can do: engage in sexual activity with women. We believe it applies equally to men and women because it prohibits both classes from engaging in sexual activity with members of their own sex. Thus, there is no denial of equal protection on that basis.

The State further contends that the statute makes no classification whatever; that § 566.090.1(3) merely prohibits conduct; and that it does not criminalize homosexuality, but only homosexual activity. We agree with this interpretation of the statute. However, such an interpretation does not dispose of the equal protection inquiry. Insofar as § 566.090.1(3) prohibits homosexuals from engaging in private consensual sexual activity, which is not prohibited to heterosexuals, it embodies a classification based upon sexual preference.

Respondent does not contend that he is a member of a group, the classification of which has been traditionally deemed "suspect." These classifications are race, e.g. *Anderson v. Martin,* 375 U.S. 399, 84 S.Ct. 454, 11 L.Ed.2d 430 (1964), national origin, e.g. *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) and alienage, e.g. *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). They obviously do not include sexual preference. Furthermore, respondent has failed to give any legal argument why the prohibition of homosexual activity is a suspect classification.

The classification at issue here is also outside the present list of classifications to which the Supreme Court has applied an intermediate level scrutiny. *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (gender-based); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (illegitimacy); *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (children of illegal aliens).

■ Amicus curiae American Civil Liberties Union argues for the application of "heightened scrutiny" to § 566.090.1(3), based on a "test" essentially similar to the inquiry undertaken by the Supreme Court in *City of Cleburne v. Cleburne Living Center,* — U.S. —, 105 S.Ct. 32 9, 87 L.Ed.2d 313 (1985). In *Cleburne,* the Court applied this analysis to determine that classifications burdening the mentally retarded are not quasi-suspect. Undertaking a similar inquiry here, we conclude that the classification embodied in § 566.090.1(3) is not quasi-suspect.

The ACLU argues, based upon social science data, that the *homosexual orientation* is something over which "[a] person has very little control * * * is not acquired voluntarily and is extremely difficult, if not impossible, to change." First, the determination sought by the ACLU is one involving the consideration, evaluation and implementation of social science date relating to the causes, treatments, etc. of the homosexual orientation. The propriety of a court making such a determination is debatable. *See,* e.g. Miller & Barron, The Supreme Court, the Adversary System, and the Flow of Information to the Justices: A Preliminary Inquiry, 61 Va.L.Rev. 1187 (1975), Korn, Law, Fact and Science in the Courts, 66 Colum.L.Rev. 1080 (1966). We believe that the weighing of such social science data is better left to the legislative department and will defer to its determinations. Second, § 566.090.1(3) does not classify on the basis of a characteristic beyond one's control. The statute merely proscribes homosexual *activity.* It cannot be said in the usual circumstance that refraining from certain conduct is beyond control. Beyond prohibiting the specified conduct, the statute imposes no other burden.

Whether the particular burden imposed is impermissible is a separate question.

It cannot be doubted that historically homosexuals have been subjected to "antipathy [and] prejudice." But, so have other classes whose members have violated society's legal and moral codes of conduct. There is a distinction between classifications that result from prejudice and judgments that result from legitimate classifications. The ACLU's position on this point begs the question of whether the classification is legitimate.

Finally, the ACLU contends that "homosexuals certainly have a strong claim [to political powerlessness] based on years of discrimination and derogatory stereotyping that inevitably augurs against bringing their legitimate concerns out into the open and into the mainstream of political give and take." We are unpersuaded. Homosexuals, as such, have never been denied the ability to engage in "political give and take." That being identified as a homosexual has involved certain political costs does not diminish this ability. The ACLU has again begged the question. If homosexual conduct is properly forbidden, any social stigma attaching to those who violate this proscription cannot be constitutionally suspect. The fact that the democratic process does not respond to those who violate its ordinances is no source of condemnation. Are we to say that drug addicts or pedophiliacs are a powerless class because the democratic process has refused to sanction the activity they seek to have sanctioned? Are we to say the same if society stigmatizes them? We think not. To hold that the losers in a public policy determination constitute a powerless class for purposes of determining the suspectness of the resulting classification is ludicrous upon its face. In sum, we hold that the classification embodied in § 566.090.1(3) is neither suspect nor quasi-suspect in relation to the respondent's status as a homosexual.

■ We turn next to the question of whether the classification is suspect as burdening the exercise of a fundamental right. Respondent and amici argue that the right of privacy as established in *Griswold, supra,* and its progeny protects "the social intimacies of private life." Respondent and amici argue that private consensual homosexual activity falls within the realm of "certain kinds of highly personal relationships" and thus enjoys "a substantial measure of sanctuary from unjustified interference by the State." *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462 (1984).

The contentions are without merit. In *Bowers v. Hardwick,* —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Court held that the United States Constitution does not confer upon consenting homosexuals a fundamental right to engage in sodomy. In view of *Bowers,* we hold that there is no fundamental right under the United States Constitution to engage in private consensual homosexual activity and that § 566.090.1(3) need not be subjected to strict scrutiny. We are left then to consider whether § 566.090.1(3) withstands scrutiny under the "rational basis" test. That test was succinctly stated by Mr. Justice Harlan in *Ferguson v. Skrupa,* 372 U.S. 726, 733, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963) (Harlan, J., concurring in judgment): "[Whether] this state measure bears a rational relation to a constitutionally permissible objective." The State contends that § 566.090.1(3) is a rational exercise of the State's inherent police power to protect and promote public health and morals.

■ Respondent and amici argue that the legislation of morality which affects private consensual conduct is not a legitimate state interest and that § 566.090.1(3) fails to bear a rational relation to promotion of public health. We reject both contentions.

Nowhere does the Constitution state that the promotion of morality is an impermissible state objective. Indeed, the Supreme Court has indicated that it is. *Berman v. Parker,* 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed.2d 27 (1954). Furthermore, we agree with the court in *Dronenburg v. Zech,* 741 F.2d 1388, 1397 (D.C.Cir.1984):

[Respondent's] theory would, in fact, destroy the basis for much of the most valued legislation our society has. It would, for example, render legislation about civil rights, worker safety, the preservation of the environment, and much more, unconstitutional. In each of these areas, legislative majorities have made moral choices contrary to the desires of minorities. It is to be doubted that very many laws exist whose ultimate justification does not rest upon the society's morality. For these reasons, [respondent's] argument will not withstand examination.

We have been cited *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980) which held that a Pennsylvania statute equivalent to § 566.090.1(3) lacked a rational basis. Without citing a single case so holding, the *Bonadio* court relied almost exclusively upon Mill's principle of autonomy. *See*, 415 A.2d, at 50–51. We are not bound by the decisions of foreign courts and consider them only for their persuasiveness. We decline to follow the Pennsylvania Supreme Court, because we believe, to borrow from Mr. Justice Black, "Whether the legislature takes for its textbook [John Stuart Mill, Thomas Aquinas[1] or Lord Devlin[2]] or some other is no concern of ours. * * * [R]elief, if any be needed, lies not with us but with the [General Assembly]." *Ferguson v. Skrupa, supra*, 372 U.S. at 732, 83 S.Ct. at 1032.

We believe further that punishing homosexual acts as a Class A misdemeanor, *see* § 566.090.2, is rationally related to the State's constitutionally permissible objective of implementing and promoting the public morality.

We further find that § 566.090.1(3) is rationally related to the State's concededly legitimate interest in protecting the public health. The State has argued that forbidding homosexual activity will inhibit the spread of sexually communicable diseases like acquired immuneo-deficiency syndrome (AIDS).

Respondent counters that "No one, including the Missouri Legislature was aware of AIDS in 1977 when this statute was enacted," and "AIDS is and can be acquired through numerous forms of conduct other than homosexual activity."

We reject both arguments. A legislative enactment will be upheld if "any state of facts reasonably can be conceived that would sustain it * * *" and notwithstanding that "it is not made with mathematical nicety * * *." *See, Lindsley v. National Carbonic Gas Co.*, 220 U.S. 61, 79, 31 S.Ct. 337, 340, 55 L.Ed.2d 369 (1911). That AIDS was not discovered until after the enactment of § 566.090.1(3) does not affect its present validity. It would be an idle exercise indeed to strike down this statute, upon the grounds urged, only to have it reenacted ostensibly based on current data. Moreover, we believe the public health aspect of § 566.090.1(3) need not be limited to the threat of AIDS. The General Assembly could well have considered that the acts proscribed presented other threats to public health. We need not refer to medical literature to suggest, for example, that there might rationally be health ramifications to anal intercourse and/or oral-genital sex.[3] Finally, the General Assembly could have reasonably concluded that the general promiscuity[4] characteristic of the homosex-

1. Aquinas, *Summa Theologica*, Q. 96, article 2: "Now human law is framed for a number of human beings, the majority of whom are not perfect in virtue. Wherefore human laws do not forbid all vices, from which the virtuous abstain, but only the more grievous vices * * * and chiefly those that are to the hurt of others * * *."

2. *See*, Devlin, The Enforcement of Morals (1965).

3. It must be said that much of the better health of advanced societies is a direct result of removing human waste from the food chain and general living areas. The combination of anal intercourse and oral-genital sex would obviously create a direct oral-fecal link. *See generally*, P. Cameron et al., Sexual Orientation and Sexually Transmitted Disease, 70 Neb.Med.J. 292 (1985).

4. This promiscuity appears both in the numerous instances of sexual activity and the frequency with which homosexuals are known to use

ual lifestyle made such acts among homosexuals particularly deserving of regulation, thus rationally distinguishing such acts within a heterosexual context. "We cannot say that that judgment is not an allowable one. * * * It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. New York*, 336 U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed.2d 533 (1949). Accordingly, we hold that § 566.090.1(3) is rationally related to the State's legitimate interest in public health.

Finally, respondent has raised a challenge to § 566.090.1(3) under the Missouri Constitution. There is no express recognition of the right of privacy in our Constitution. However, in *Barber v. Time Inc.*, 348 Mo. 1199, 1205, 1206, 159 S.W.2d 291, 294 (1942), this Court stated that "[t]he basis of the right of privacy is the right to be let alone" and that "the right of privacy * * * is, or at least grows out of, a constitutional right." The cases decided by this Court under the right of privacy announced in *Barber* have generally involved, as did *Barber* itself, protection against publication of private facts. *See, Biederman's of Springfield, Inc. v. Wright*, 322 S.W.2d 892 (Mo.1959), *Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385 (Mo.1963); *State v. Nolan*, 316 S.W.2d 630, 634 (Mo. 1958). *See also, Corcoran v. Southwestern Bell Telephone Co.*, 572 S.W.2d 212 (Mo.App.1978). Its applicability to cases such as this one has never been addressed by this Court. Whatever its reach, however, the application of Missouri's right of privacy to date has not paralleled the right of privacy said to inhere in the Federal Constitution. Thus, without the parties having addressed the distinct nature of

Missouri's right of privacy apart from federal doctrines, we decline to decide this case on that basis. We will say, however, that whatever justification there may be for a nonoriginalist interpretation of the older United States Constitution, we believe that our Constitution of 1945 must be interpreted according to its plain language and original intent. *State ex inf. Danforth v. Cason*, 507 S.W.2d 405, 408, 409 (Mo. banc 1973).

For all the foregoing reasons, the dismissal is reversed and the cause is remanded.

Higgins, C.J., and Billings, Robertson and Rendlen, JJ., concur.

Welliver, J., dissents in separate opinion filed.

Blackmar, J., dissents in separate opinion filed and concurs in separate dissenting opinion of Welliver, J.

Donnelly, J., files separate opinion.

WELLIVER, Judge, dissenting.

I respectfully dissent.

What dire offense from amorous causes springs,
What mighty contests rise from trivial things!
> The Rape of the Lock, by Alexander Pope.

Just as the theft of a lock of hair created pandemonium in Pope's poem, today a slight touch through layers of clothing has loosed great ideas and great minds. From the mountain, which I perceive to be a molehill, the principal opinion speaks on the mighty issues of jurisprudence and constitutional law raised primarily by respondent's friends. I fear that respondent is

---

new and anonymous partners. One study reported as follows:

> Almost one-half of the white homosexual males (WHMs) and one-third of the black homosexual males (BHMs) said that they had had at least five hundred different sexual partners during the course of their homosexual careers. Another third of the WHMs and a quarter of the BHMs reported having had between one hundred and five hundred partners.

A. Bell & M. Weinberg, Homosexualities: A Study of Diversity Among Men and Women, 85 (1978). Of those respondents who indicated 500 or more partners in their careers, 28% of WHMs and 19% of BHMs indicated they had 1000 or more partners in their careers. *Id.* at 3C8. Seventy-nine percent of WHMs and 51% BHMs responded that more than half of their partners were strangers. *Id.*

more hurt than helped by his friends, the amici,[1] who I believe are more interested in establishing constitutional protection for homosexuals than in securing the freedom of this individual who is the victim of a woefully insufficient information.

Confronted with a case involving a charge of attempted sexual misconduct, I would turn first to the statutes involved to determine if the facts pled in the information constitute a crime.[2] The general attempt statute requires the criminal attemptor to intend to commit a crime and, in addition, he must commit an "act which is a *substantial step* towards the commission of the offense." § 564.011.1, RSMo 1978 (emphasis added). Without a strict requirement of an overt act, we run the risk of punishing men for mere accidental touchings based upon an officer's translation of a glimmer in the toucher's eye.

The simple touch of a fully clothed man is not sufficiently unambiguous to equal "conduct which is *strongly corroborative* of the firmness of the actor's purpose to complete the commission of the offense." § 564.011.1, RSMo 1978 (emphasis added). I would not sanction the arrest for attempted sexual misconduct of quarterbacks or wrestlers, nor can I approve the arrest of respondent on this flimsy information. The overt act alleged in this information may be as harmless as a wink or a leer. In this case, the policeman set the hook too soon.

I would affirm the trial court.

BLACKMAR, Judge, dissenting.

I join in the dissenting opinion of Judge Welliver. I also associate myself with the reservation indicated in Judge Donnelly's separate opinion.

We are obliged to affirm a judgment if it is correct, even though we may disagree with the reasons given by the trial judge. The state's contrary contention on oral argument is clearly wrong. Judge Welliver properly bases his dissent on the insufficiency of the information.

I am also inclined to believe that § 566.-010, RSMo 1978, goes beyond the limits of state power in defining "deviate sexual intercourse" as involving the hand. This is not the offense of sodomy as discussed in the opinion of the Supreme Court of the United States in *Bowers v. Hardwick*, —— U.S. ——, 106 S.Ct. 2841, 92 L.Ed.2d 140 (U.S. June 30, 1986) (No. 85–140), and it has no long history of legal sanction such as seemed very important to Justice White in that case. *Bowers* recognizes a right of privacy under the Constitution of the United States, but holds that this right of privacy does not extend to offenses traditionally punished as sodomy. Its rationale is absent here.

DONNELLY, Judge.

Section 4 of Article 2 of the Constitution of 1875 asserted "that all persons have a natural right to life [and] liberty * * *."

In 1942, in *Barber v. Time, Inc.*, 348 Mo. 1199, 1205, 159 S.W.2d 291, 294 (1942), this Court found in Section 4, *supra*, a constitutional right to be let alone.

In the Constitution of 1945, the people asserted again "that all persons have a natural right to life [and] liberty * * *." Mo. Const. art. I, § 2.

In this circumstance, the holding in *Bowers*, which dealt "with judge-made constitutional law having little or no cognizable roots in the language or design of the [Federal] Constitution," may, or may not,

---

1. American Civil Liberties Union of Eastern Missouri, Lambda Legal Defense and Education Fund, Inc., Missouri State National Organization for Women, Federation of Parents and Friends of Lesbians and Gays, The Agape Church of St. Louis, St. Louis Lesbian and Gay Pride Celebration Committee, St. Louis Gay Men's Support Group, and Washington University Gay and Lesbian Community Alliance.

2. **Attempt.—1.** A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A **"substantial step"** is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense. § 564.011, RSMo 1978.

be considered persuasive when this Court is confronted with the question whether, under *our* Constitution, the General Assembly may make private consensual conduct a crime.

I file this separate opinion because I wish to expressly reserve this question for another day. "It cannot be suggested that in cases where the author is the mere instrument of the Court he must forego expression of his own [reservations]." *Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 576, 69 S.Ct. 1291, 1299, 93 L.Ed.2d 1544 (1949) (by Jackson, J.). *See* also opinions by Mr. Justice Brennan in *Abbate v. United States,* 359 U.S. 187, 196, 79 S.Ct. 666, 671, 3 L.Ed.2d 729 (1959).