COMMONWEALTH of Kentucky, Appellant,

v.

Jeffrey WASSON, et al., Appellees.

No. 90-SC-558-TG.

Supreme Court of Kentucky.

Sept. 24, 1992.

Rehearing Denied Jan. 21, 1993.

Chris Gorman, Atty. Gen., David A. Smith, Kent T. Young, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellant.

Ernesto Scorsone, Scorsone & Ransdell, Pam Goldman, Dean W. Bucalos, Brown, Bucalos, Santana & Bratt, Lexington, for appellee.

Louis A. Ball, President, Ky. Commonwealth's Attys. Assoc., Newport, Michael E. Conliffe, President, Kentucky County Attys. Assoc., Louisville, for amici curiae Kentucky Commonwealth's Attys. Assoc. and Kentucky County Attys. Assoc.

Ronald D. Ray, John L. Weeks, Louisville, for amici curiae Citizens for Decency Through Law, etc.

George B. Bertram, Campbellsville, Dennis H. Staffelbach, Tupelo, MS, for amicus curiae Am. Family Assoc. Law Center.

Kenneth C. Plotnik, Louisville, Stanley M. Spracker, Joshua L. Sheinkman, Jin-Kyu Koh, Weil, Gotshal & Manges, Washington, DC, for amici curiae Am. Public Health Assoc., etc.

David W. Ogden, Cynthia Misicka, Jenner & Block, Washington, DC, Allen W. Holbrook, Owensboro, for amici curiae Am. Psychological Assoc., etc.

Ruth E. Harlow, William B. Rubenstein, New York City, David A. Friedman, Louisville, for amici curiae Am. Friends Service Comm., etc.

Frank E. Haddad, Jr., Stephen P. Durham, Louisville, William E. Johnson, Lexington, for amicus curiae Ky. Assoc. of Criminal Defense Lawyers.

Carolyn F. Shain, Eric J. Graninger, C. Frederick Jenkins, Louisville, for amici curiae James E. Andrews, etc.

LEIBSON, Justice.

Appellee, Jeffrey Wasson, is charged with having solicited an undercover Lexington policeman to engage in deviate sexual intercourse. KRS 510.100 punishes "deviate sexual intercourse with another person of the same sex" as a criminal offense, and specifies "consent of the other person shall not be a defense." Nor does it matter that the act is private and involves a caring relationship rather than a commercial one. It is classified as a Class A misdemeanor.

The appellee is actually charged under KRS 506.030, which covers "solicitation" to commit any criminal offense. If the offense solicited is a Class A misdemeanor, solicitation of the offense is punished as a Class B misdemeanor. KRS 506.030(2)(d). The issue here is whether KRS 510.100, which defines the underlying criminal offense, is constitutional.

The charges were brought in the Fayette District Court where appellee moved to dismiss the charge on grounds that a statute criminalizing deviate sexual intercourse between consenting adults of the same sex, even if the act is committed in the privacy of a home, violates the Kentucky Constitution as: (1) an invasion of a constitutionally protected right of privacy; and (2) invidious discrimination in violation of constitutionally protected rights to equal treatment.

The Fayette District Judge held the statute violated appellee's right of privacy, and dismissed the charge. The Commonwealth

appealed to Fayette Circuit Court which affirmed, and further held this statute infringed upon equal protection guarantees found in the Kentucky Constitution. Once more the Commonwealth appealed, and, because of the constitutional issues involved, this Court granted transfer.

Both courts below decided the issues solely on state constitutional law grounds, and our decision today, affirming the judgments of the lower courts, is likewise so limited. Federal constitutional protection under the Equal Protection Clause was not an issue reached in the lower courts and we need not address it. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) held federal constitutional protection of the right of privacy was not implicated in laws penalizing homosexual sodomy. We discuss *Bowers* in particular, and federal cases in general, not in the process of construing the United States Constitution or federal law, but only where their reasoning is relevant to discussing questions of state law.

A third issue presented at the trial level was whether KRS 510.100 violated state and federal constitutional protections against cruel punishment. This issue was decided against Wasson in District Court, but not addressed in the Circuit Court judgment. The issue is not preserved, and we decline to discuss it.

The brief statement of facts upon which the District Court rendered judgment is as follows:

Lexington police were conducting a downtown undercover operation. Their modus operandi was to drive to a certain parking area, in plain clothes with microphones on their persons, and try to engage in conversation with persons passing by to see whether they would be solicited for sexual contact. The taped conversation between the undercover officer and Wasson covered approximately 20–25 minutes, toward the end of which Wasson invited the officer to "come home" to his residence. The officer then prodded Wasson for details, and Wasson suggested sexual activities which violated KRS 510.100. There was no suggestion that sexual activity would occur anyplace other than in the privacy of Wasson's home. The sexual activity was intended to have been between consenting adults. No money was offered or solicited.

Seven expert witnesses testified in support of Wasson's case: (1) a cultural anthropologist testified about the presence of homosexuals in every recorded human culture, including societies where they were rejected and those where they have been tolerated or even welcomed; (2) a Presbyterian minister discussed Biblical references, providing a modern interpretation that these references were not an indictment of homosexuals as such, but rather statements against aggression, inhospitality and uncaring relationships; (3) a social historian testified about the presence of homosexuals throughout the history of the United States, despite what was at times exceptionally strict punishment for homosexual acts; (4) a sociologist and sex researcher (a co-author of the Kinsey Report on homosexual behavior) testified that studies indicated " 'homosexuality' is just as deep-rooted as 'heterosexuality'," that it is not a choice and there is no "cure" for it, and that sexual acts prohibited to homosexuals by KRS 510.100, oral and anal sex, are practiced widely by heterosexuals; (5) a psychologist testified that homosexuality is no longer classified as a personality disorder by either the American Psychological Association or the American Psychiatric Association, and further, rather than being in and of themselves either harmful or pathological, the sexual acts outlawed by KRS 510.100 are a necessary adjunct to their sex life; (6) a therapist from a comprehensive care treatment center in Lexington, with fourteen years' experience counseling homosexual clients, testified that the statute criminalizing their sexual activities has an adverse impact on homosexuals and interferes with efforts to provide therapy to those who may need it; and (7) the Professor of Medicine at the University of Louisville, Chief of the Infectious Diseases section, testified at length about the origins and spread of AIDS, expressing the opinion that the statute in question offers no benefit in preventing the spread

**490**

of the disease and can be a barrier to getting accurate medical histories, thus having an adverse effect on public health efforts.

The testimony from Wasson's expert witnesses is further substantiated by extensive citations to medical and social science literature and treatises supplied in Amicus Curiae Briefs filed by national and state associations of psychologists and clinical social workers, various national and state public health associations, and organizations covering a broad spectrum of religious denominations.[1]

The Commonwealth, on the other hand, presented no witnesses and offers no scientific evidence or social science data. Succinctly stated, its position is that the majority, speaking through the General Assembly, has the right to criminalize sexual activity it deems immoral, without regard to whether the activity is conducted in private between consenting adults and is not, in and of itself, harmful to the participants or to others; that, if not in all instances, at least where there is a Biblical and historical tradition supporting it, there are no limitations in the Kentucky Constitution on the power of the General Assembly to criminalize sexual activity these elected representatives deem immoral.

The Commonwealth maintains that the United States Supreme Court's decision in *Bowers v. Hardwick, supra,* is dispositive of the right to privacy issue; that the "Kentucky Constitution did not intend to confer any greater right to privacy than was afforded by the U.S. Constitution." Turning to the equal protection argument raised by a statute which criminalizes oral or anal intercourse between persons of the same sex, but not between persons of different sexes, which was not addressed in the *Bowers* case, the Commonwealth argues there is "a rational basis for making such a distinction." To support this argument the Commonwealth takes bits and pieces from the testimony of Wasson's expert witnesses out of context and disregards their overwhelming evidence to the contrary. The thrust of the argument advanced by the Commonwealth as a rational basis for criminalizing consensual intercourse between persons of the same sex, when the same acts between persons of the opposite sex are not punished, is that the level of moral indignation felt by the majority of society against the sexual preference of homosexuals justifies having their legislative representatives criminalize these sexual activities. The Commonwealth believes that homosexual intercourse is immoral, and that what is beyond the pale of majoritarian morality is beyond the limits of constitutional protection.

At the outset the subject is made difficult by a confusion of terms. KRS 510.100 is styled a "sodomy" statute, but its reach is not limited to the Biblical or traditional common law definition of the term. It punishes "deviate sexual intercourse with another of the same sex." "Deviate sexual intercourse" is defined in KRS 510.010(1) as including "any act of sexual gratification involving the sex organs of one (1) person and the mouth or anus of another[.]"

A significant part of the Commonwealth's argument rests on the proposition that homosexual sodomy was punished as an offense at common law, that it has been punished by statute in Kentucky since 1860, predating our Kentucky Constitution. Indeed, in *Bowers v. Hardwick, supra,* 478 U.S. at 193, n. 6, 106 S.Ct. at 2846, n. 6, the United States Supreme Court takes note of

1. Specifically, the associations and organizations represented on these Amici Curiae Briefs are: American Psychological Association, Kentucky Psychological Association, Kentucky Psychiatric Association, Kentucky Chapter of the National Association of Social Workers, and Kentucky Society for Clinical Social Workers; American Public Health Association, Community Health Trust, Inc., Heart To Heart, Inc., St. Jude Guild, Inc., and AIDS Education Coalition, Inc.; American Friends Service Committee, American Jewish Committee, Central Presbyte- rian Church, Louisville, First Unitarian Church of Louisville, Honesty, Louisville, Lexington Friends Meeting, Religious Society of Friends (Quakers), The United Church of Christ, Telos, Louisville, The Temple, Union of American Hebrew Congregations, Unitarian Universalist Association and Universalist Church of Lexington, Central Kentucky Council for Peace and Justice, Fellowship of Reconciliation, Central Kentucky and Louisville Chapters, Presbyterian Church [U.S.A.] and the United Methodist Church.

the original Kentucky statute codifying the common law found at 1 Ky.Rev.Stat., Ch. 28, Art. IV, Sec. 11 (1860). This, of course, would lend credence to the historical and traditional basis for punishing acts of sodomy, but for the fact that "sodomy" as defined at common law and in this 1860 statute is an offense significantly different from KRS 510.100, limited to *anal* intercourse between *men*. Unlike the present statute our common law tradition punished *neither oral copulation nor any form of deviate sexual activity between women.* The definitive Kentucky case on the subject is *Commonwealth v. Poindexter*, 133 Ky. 720, 118 S.W. 943 (1909), summarizing the common law and statutory background, and holding:

"A penetration of the mouth is not sodomy."

In *Poindexter* two men were charged with sodomy "committed by the insertion of the private part of the one into the mouth of the other." The trial court dismissed the indictment as failing to state an offense, and our Court affirmed. In *United States v. Milby*, 400 F.2d 702, 704 (6th Cir.1968), applying the *Poindexter* holding, the Court states:

"Concededly, by virtue of *Commonwealth v. Poindexter*, 133 Ky. 720, 118 S.W. 943 (1909), in order for the act of sodomy to be committed by one person on another, under Kentucky law, it is necessary that there be anal penetration."

The Commentary to the Penal Code enacted in 1974 points out:

"Under former Kentucky law penetration of the mouth was not sufficient. . . .

Sodomy in the fourth degree . . . broadens former Kentucky law by including oral copulation." Commentary, KRS 510.070.

Thus the statute in question here punishes conduct which has been historically and traditionally viewed as immoral, but much of which has never been punished as criminal.

The grounds stated by the District Court for striking down the statute as unconstitutional are:

"KRS 510.100 clearly seeks to regulate the most profoundly private conduct and in so doing impermissibly invades the privacy of the citizens of this state.

Having so found, the Court need not address the other issues raised by the parties."

The Order expressing the judgment of the Fayette Circuit Court "agree[d] with that conclusion," and further held the statute "unjustifiably discriminates, and thus is unconstitutional under Sections 2 and 3 of our Kentucky Constitution." These Sections are:

"§ 2. Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority.

§ 3. All men, when they form a social compact, are equal. . . ."

These Sections, together with Sections 59 and 60 of our Kentucky Constitution which prohibit "local or special" legislation, express the guarantee of equal treatment provided by the law in our Kentucky Constitution. The lower courts' judgments limit their finding of unconstitutionality to *state* constitutional grounds. *Bowers v. Hardwick, supra*, speaks neither to rights of privacy under the state constitution nor to equal protection rights under either federal or state constitutions. *Bowers* addressed the constitutionality of a Georgia statute prohibiting acts of consensual sodomy between persons of the same sex *or* the opposite sex. Because the Georgia statute embraced both heterosexual and homosexual conduct, the *Bowers* opinion did not involve the Equal Protection Clause of the Fourteenth Amendment.

For reasons that follow, we hold the guarantees of individual liberty provided in our 1891 Kentucky Constitution offer greater protection of the right of privacy than provided by the Federal Constitution as interpreted by the United States Supreme Court, and that the statute in question is a violation of such rights; and, further, we hold that the statute in ques-

tion violates rights of equal protection as guaranteed by our Kentucky Constitution.

## I. RIGHTS OF PRIVACY

■ No language specifying "rights of privacy," *as such,* appears in either the Federal or State Constitution. The Commonwealth recognizes such rights exist, but takes the position that, since they are implicit rather than explicit, our Court should march in lock step with the United States Supreme Court in declaring when such rights exist. Such is not the formulation of federalism. On the contrary, under our system of dual sovereignty, it is our responsibility to interpret and apply our state constitution independently. We are not bound by decisions of the United States Supreme Court when deciding whether a state statute impermissibly infringes upon individual rights guaranteed in the State Constitution so long as state constitutional protection does not fall below the federal *floor,* meaning the minimum guarantee of individual rights under the United States Constitution· as interpreted by the United States Supreme Court. *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575 (1975). The holding in *Oregon v. Hass* is:

> "[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this [United States Supreme] Court holds to be necessary upon federal constitutional standards." [Emphasis original.]

Contrary to popular belief, the Bill of Rights in the United States Constitution represents neither the primary source nor the maximum guarantee of state constitutional liberty. Our own constitutional guarantees against the intrusive power of the state do not derive from the Federal Constitution. The adoption of the Federal Constitution in 1791 was preceded by state constitutions developed over the preceding 15 years, and, while there is, of course, overlap between state and federal constitutional guarantees of individual rights, they are by no means identical. State constitutional law documents and the writings on liberty were more the source of federal law

than the child of federal law. *See* Vol. 1:1988, "Emerging Issues in State Constitutional Law," A.E. Dick Howard, *The Renaissance of State Constitutional Law.* The Virginia Bill of Rights, which had great impact, preceded not only the Bill of Rights in the United States Constitution, but by one month the Declaration of Independence. In an article in the Kentucky Law Journal, Vol. 80: 1991–92, No. 1, *The Kentucky Bill of Rights: A Bicentennial Celebration,* by Gormley and Hartman, the authors attribute the source of much of our original Kentucky Bill of Rights to the then recently enacted Pennsylvania counterpart:

> "A comparison of the Kentucky Bill of Rights of 1792 and a number of earlier, now defunct constitutions of the leading colonies, demonstrates unequivocally that the original Kentucky Bill of Rights was borrowed almost verbatim from the Pennsylvania Constitution of 1790."

The evidence supporting this proposition is carefully documented in the article. Thus, while we respect the decisions of the United States Supreme Court on protection of individual liberty, and on occasion we have deferred to its reasoning, certainly we are not bound to do so, and we should not do so when valid reasons lead to a different conclusion.

We are persuaded that we should not do so here for several significant reasons. First, there are both textual and structural differences between the United States Bill of Rights and our own, which suggest a different conclusion from that reached by the United States Supreme Court is more appropriate. More significantly, Kentucky has a rich and compelling tradition of recognizing and protecting individual rights from state intrusion in cases similar in nature, found in the Debates of the Kentucky Constitutional Convention of 1890 and cases from the same era when that Constitution was adopted. The judges recognizing that tradition in their opinions wrote with a direct, firsthand knowledge of the mind set of the constitutional fathers, upholding the right of privacy against the intrusive police power of the state. This tradition is formulated in ringing terms in the opinion of this Court in *Common-*

*wealth v. Campbell*, 133 Ky. 50, 117 S.W. 383 (1909), but it is also the common thread found in *Commonwealth v. Smith*, 163 Ky. 227, 173 S.W. 340 (1915), *Hershberg v. City of Barbourville*, 142 Ky. 60, 133 S.W. 985 (1911), *Adams Express Co. v. Commonwealth*, 154 Ky. 462, 157 S.W. 908 (1913), and *Lewis v. Commonwealth*, 197 Ky. 449, 247 S.W. 749 (1923). Leading tort cases grounded on that same right of privacy include *Foster–Milburn Co. v. Chinn*, 134 Ky. 424, 120 S.W. 364 (1909), *Douglas v. Stokes*, 149 Ky. 506, 149 S.W. 849 (1912), and *Brents v. Morgan*, 221 Ky. 765, 299 S.W. 967 (1927).

Kentucky cases recognized a legally protected right of privacy based on our own constitution and common law tradition long before the United States Supreme Court first took notice of whether there were any rights of privacy inherent in the Federal Bill of Rights. The first mention of a federal guarantee of the right of privacy is in the Dissenting Opinion of Justice Louis Brandeis in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), in which he defined it as "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." Actual recognition by the majority as a working premise came much later in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The list of individual rights guaranteed by the Federal Bill of Rights is patently incomplete; ergo the Ninth Amendment stating:

> "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

Federal constitutional analysis has proceeded from so-called "emanations" and "penumbras" of the First, Third, Fourth and Fifth Amendments in the Bill of Rights. These amendments elaborate *some* of the "blessings of liberty" referred to in the Preamble to the United States Constitution, but by no means all of them. It is because the United States Supreme Court has recognized that the list is not exclusive, not even for purposes of federal constitutional protection, that it has undertaken, using the Due Process Clauses in the Fifth and Fourteenth Amendments, to create a so-called zone of privacy constitutionally beyond the reach of governmental intrusion. But the United States Supreme Court is extremely reticent in extending the reach of the Due Process Clauses in substantive matters, albeit this is the jurisprudence of this century and not before, following President Franklin D. Roosevelt's court packing efforts in the 1930's.

*Bowers v. Hardwick, supra,* expresses this reticence. The United States Supreme Court, defining the reach of the zone of privacy in terms of federal due process analysis, limits rights of privacy to "liberties that are 'deeply rooted in this Nation's history and tradition.'" 478 U.S. at 192, 106 S.Ct. at 2844. Sodomy is not one of them. *Bowers v. Hardwick* decides that rights protected by the Due Process Clauses in the Fifth and Fourteenth Amendments to the United States Constitution do not "extend a fundamental right to homosexuals to engage in acts of consensual sodomy." *See* 478 U.S. at 192, 106 S.Ct. at 2844.

■ *Bowers* decides nothing beyond this. But state constitutional jurisprudence in this area is not limited by the constraints inherent in federal due process analysis. Deviate sexual intercourse conducted in private by consenting adults is not beyond the protections of the guarantees of individual liberty in our Kentucky Constitution simply because "proscriptions against that conduct have ancient roots." 478 U.S. at 192. Kentucky constitutional guarantees against government intrusion address substantive rights. The only reference to individual liberties in the Federal Constitution is the statement in the Preamble that one of the purposes in writing in the Constitution is to "secure the Blessings of Liberty to ourselves and our Posterity." Similarly, the Kentucky Constitution has a Preamble:

> "We, the people of the Commonwealth of Kentucky, grateful to Almighty God for the civil, political and religious liber-

ties we enjoy, and invoking the continuance of these blessings, do ordain and establish this Constitution."

But the Kentucky Constitution of 1891 does not limit the broadly stated guarantee of individual liberty to a statement in the Preamble. It amplifies the meaning of this statement of gratitude and purpose with a Bill of Rights in 26 sections, the first of which states:

"§ 1. All men are, by nature, free and equal, and have certain inherent and inalienable rights, among which may be reckoned:

First: The right of enjoying and defending their lives and liberties.

....

Third: The right of seeking and pursuing their safety and happiness.

....

§ 2. Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

While addressing *some* of the same considerations as those expressed in the Preamble to the Federal Constitution, none of this textual material appears in the Federal Constitution. Both the record of the 1890–91 debates and the opinions of Justices of this Court who were the contemporaries of our founding fathers express protection of individual liberties significantly greater than the selective list of rights addressed by the Federal Bill of Rights. There was no mention of a right of privacy in these debates only because the concept was not verbalized as such until after the article by Warren and Brandeis, *The Right of Privacy,* 4 Harv.L.Rev. 193, December 15, 1890, had been publicly disseminated. The ideas Brandeis and Warren expressed in that article as the "right of privacy" were neither unique to the authors nor confined to the Harvard Law School. They were an expression of contemporary thought.

The Commonwealth has stressed that there was no discussion of the right of privacy at the 1890 Kentucky Constitutional Convention, but that is only partly true. The meaning of Sections One and Two as they apply to personal liberty is found in the remarks of J. Proctor Knott of Marion County (see Official Report of the Proceedings and Debates in the 1890 Convention, E. Polk Johnson, Vol. 1, p. 718):

"[T]hose who exercise that power in organized society with any claim of justice, derive it from the people themselves. That with the whole of such power residing in the people, the people as a body rest under the highest of all moral obligations to protect each individual in the rights of life, liberty, and the pursuit of happiness, *provided that he shall in no wise injure his neighbor in so doing."* [Emphasis added.]

See also Comments of Delegate J.A. Brents from Clinton County. Debates, Vol. 1, p. 614–18, concluding "majorities cannot and ought not exercise arbitrary power over the minority."

The leading case on this subject is *Commonwealth v. Campbell, supra.* At issue was an ordinance that criminalized possession of intoxicating liquor, even for "private use." Our Court held that the Bill of Rights in the 1891 Constitution prohibited state action thus intruding upon the "inalienable rights possessed by the citizens" of Kentucky. *Id.* 117 S.W. at 385.

Our Court interpreted the Kentucky Bill of Rights as defining a right of privacy, even though the constitution did not say so in that terminology:

"Man in his natural state has the right to do whatever he chooses and has the power to do. When he becomes a member of organized society, under governmental regulation, he surrenders, of necessity, all of his natural right the exercise of which is, or may be, injurious to his fellow citizens. This is the price that he pays for governmental protection, but it is not within the competency of a free government to invade the sanctity of the absolute rights of the citizen any further than the direct protection of society requires.... It is *not within the competency of government to invade the privacy of a citizen's life and to regulate his conduct in matters in which he alone is concerned,* or to prohibit him

any liberty the exercise of which will not directly injure society. *Id.* [Emphasis added.]

. . . .

... let a man therefore be ever so abandoned in his principles, or vicious in his practice, provided he keeps his wickedness to himself, and does not offend against the rules of public decency, he is out of the reach of human laws." *Id.* at 386.

The Court concludes, at p. 387:

"The theory of our government is to allow the largest liberty to the individual commensurate with the public safety, or, as it has been otherwise expressed, that government is best which governs least. Under our institutions there is no room for that inquisitorial and protective spirit which seeks to regulate the conduct of men in matters in themselves indifferent, and to make them conform to a standard, not of their own choosing, but the choosing of the lawgiver...."

The right of privacy has been recognized as an integral part of the guarantee of liberty in our 1891 Kentucky Constitution since its inception. The *Campbell* case is overwhelming affirmation of this proposition:

"[W]e are of the opinion that it never has been within the competency of the Legislature to so restrict the liberty of this citizen, and certainly not since the adoption of the present [1891] Constitution. The Bill of Rights, which declares that among the inalienable rights possessed by the citizens is that of seeking and pursuing their safety and happiness, and that the absolute and arbitrary power over the lives, liberty, and property of freeman exists nowhere in a republic, not even in the largest majority, would be but an empty sound if the Legislature could prohibit the citizen the right of owning or drinking liquor, when in so doing he did not offend the laws of decency by being intoxicated in public...." *Id.* at 385.

In *Adams Exp. Co. v. Kentucky,* 238 U.S. 190, 35 S.Ct. 824, 59 L.Ed. 1267 (1915), the United States Supreme Court quotes this language from the *Campbell* case, and then holds:

"It therefore follows that, inasmuch as the facts of this case show that the liquor was not to be used in violation of the laws of the state of Kentucky, as such laws are construed by the highest court of that state, the Webb–Kenyon [federal] law has no application and no effect to change the general rule that the states may not regulate commerce wholly interstate." *Id.* 238 U.S. at 202, 35 S.Ct. at 828, 59 L.Ed. at 1271.

At the time *Campbell* was decided, the use of alcohol was as much an incendiary moral issue as deviate sexual behavior in private between consenting adults is today. Prohibition was the great moral issue of its time. It was addressed both in the 1891 Constitution and in the Nineteenth Amendment of the United States Constitution. In 1907, in *Board of Trustees of Town of New Castle v. Scott,* 125 Ky. 545, 101 S.W. 944 (1907), Chief Justice O'Rear passionately attacked the evil of alcohol in a pro-prohibition ruling interpreting Section 61 of the Kentucky Constitution, which provides for local option elections. He stated:

"There is yet another view of the subject which we must assume was in the mind of the Convention. The liquor traffic had then [in 1891] come to be regarded as one of the most serious evils of the age, if not the most sinister menace to society that was known.

. . . .

No other subject had been more clearly settled upon as being within the legitimate exercise of the police power of the state than the regulation of the sale and use of intoxicating liquors." *Id.* 101 S.W. at 948.

Notwithstanding their strong views that drinking was immoral, this same Court with these same judges, including Judge O'Rear, in the *Campbell* case recognized that private possession and consumption of intoxicating liquor was a liberty interest beyond the reach of the state.

Nor is the *Campbell* case an aberration. Subsequent cases cited and followed *Campbell.* In *Commonwealth v. Smith,*

163 Ky. 227, 173 S.W. 340 (1915), citing *Campbell,* the Court declared a statute unconstitutional that had led to Smith being arrested for drinking beer in the backroom of an office:

> "The power of the state to regulate and control the conduct of a private individual is confined to those cases where his conduct injuriously affects others. With his faults or weaknesses, which he keeps to himself, and which do not operate to the detriment of others, the state as such has no concern." *Id.,* 173 S.W. at 343.

The holding in *Smith* is that "the police power may be called into play [only] when it is reasonably necessary to protect the *public* health, or *public* morals, or *public* safety." [Emphasis added.]

■ The clear implication is that immorality in private which does "not operate to the detriment of others," is placed beyond the reach of state action by the guarantees of liberty in the Kentucky Constitution.

In *Hershberg v. City of Barbourville,* 142 Ky. 60, 133 S.W. 985 (1911), also citing *Campbell,* the Court declared an ordinance which purported to regulate cigarette smoking in such broad terms that it could be applied to persons who smoked in the privacy of their own home "unreasonably interfere[ed] with the right of the citizen to determine for himself such personal matters." 133 S.W. at 986.

In the area of civil law, Kentucky has been in the forefront in recognizing the right of privacy. In 1909, our Court stepped outside traditional libel law and recognized invasion of privacy as a tort in *Foster–Milburn Co. v. Chinn, supra.* Then in 1927, in *Brents v. Morgan, supra,* our Court defined this emerging right as "the right to be left alone, that is, the right of a person to be free from unwarranted publicity, or the right to live without unwarranted interference by the public about matters with which the public is not necessarily concerned."

> "The right of privacy is incident to the person and not to property.... It is considered as a natural and an absolute or pure right springing from the instincts of nature. It is of that class of rights which every human being has in his natural state and which he did not surrender by becoming a member of organized society. The fundamental rights of personal security and personal liberty, include the right of privacy, the right to be left alone.... The right to enjoy life [Ky. Const., § 1, first subpart] in the way most agreeable and pleasant, and the right of privacy is nothing more than a right to live in a particular way." *Id.* at 971, quoting 21 RCL parg. 3, p. 1197.

*See* also *Grigsby and Wife v. R.J. Breckinridge,* 65 Ky. (2 Bush) 480 (1867) and *Douglas v. Stokes,* 149 Ky. 506, 149 S.W. 849 (1912), for further confirmation that the right of privacy has long been considered an inalienable right legally protected in this state.

In the *Campbell* case our Court quoted at length from the "great work" *On Liberty* of the 19th century English philosopher and economist, John Stuart Mill. We repeat the quote in part:

> "The only part of the conduct of anyone, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute.... The principle requires liberty of taste and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong." 117 S.W. at 386.

Mill's premise is that "physical force in the form of legal penalties," i.e., criminal sanctions, should not be used as a means to improve the citizen. *Id.* The majority has no moral right to dictate how everyone else should live. Public indignation, while given due weight, should be subject to the overriding test of rational and critical analysis, drawing the line at harmful consequences to others. Modern legal philosophers who follow Mill temper this test with an enlightened paternalism, permitting the law to intervene to stop self-inflicted harm such as the result of drug taking, or failure to

use seat belts or crash helmets, not to enforce majoritarian or conventional morality, but because the victim of such self-inflicted harm becomes a burden on society. *See Introduction to Jurisprudence*, 4th ed, p. 59 (1979) by Lord Lloyd of Hampstead.

Based on the *Campbell* opinion, and on the Comments of the 1891 Convention Delegates, there is little doubt but that the views of John Stuart Mill, which were then held in high esteem, provided the philosophical underpinnings for the reworking and broadening of protection of individual rights that occurs throughout the 1891 Constitution.

We have recognized protection of individual rights greater than the federal floor in a number of cases, most recently: *Ingram v. Commonwealth*, Ky., 801 S.W.2d 321 (1990), involving protection against double jeopardy and *Dean v. Commonwealth*, Ky., 777 S.W.2d 900 (1989), involving the right of confrontation. Perhaps the most dramatic recent example of protection of individual rights under the state Constitution where the United States Supreme Court had refused to afford protection under the Federal Constitution, is *Rose v. Council for Better Educ., Inc.*, Ky., 790 S.W.2d 186 (1989). In *Rose*, our Court recognized our Kentucky Constitution afforded individual school children from property poor districts a fundamental right to an adequate education such as provided in wealthier school districts, even though 16 years earlier the United States Supreme Court held the Federal Constitution provided no such protection in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The United States Supreme Court found there was no constitutional, or fundamental, right to a particular quality of education which justified invoking the Equal Protection Clause of the Fourteenth Amendment. Our Court found a duty in the Kentucky constitutional requirement that the General Assembly "provide an efficient system of common schools." Ky. Const. Sec. 183. In so doing we stated:

"We have decided this case solely on the basis of our Kentucky Constitution, Sec. 183. We find it unnecessary to inject any issues raised under the United States Constitution or the United States Bill of Rights in this matter." *Rose* at 215.

In *Fannin v. Williams*, Ky., 655 S.W.2d 480 (1983), we held unconstitutional a statute that would permit the state librarian to supply textbooks to children in the state's non-public schools, even though in *Bd. of Education v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), the United States Supreme Court had held a statute accomplishing a similar purpose did not violate the "establishment of religion" clause in the United States Constitution. We stated:

"The problem in this case is not whether the challenged statute passes muster under the federal constitution as interpreted by the United States Supreme Court, but whether it satisfies the much more detailed and explicit proscriptions of the Kentucky Constitution. It does not." 655 S.W.2d at 483.

We view the United States Supreme Court decision in *Bowers v. Hardwick, supra*, as a misdirected application of the theory of original intent. To illustrate: as a theory of majoritarian morality, miscegenation was an offense with ancient roots. It is highly unlikely that protecting the rights of persons of different races to copulate was one of the considerations behind the Fourteenth Amendment. Nevertheless, in *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the United States Supreme Court recognized that a contemporary, enlightened interpretation of the liberty interest involved in the sexual act made its punishment constitutionally impermissible.

According to *Bowers v. Hardwick*, "until 1961, all 50 States outlawed sodomy, and today, 25 States and District of Colombia continue to provide criminal penalties for sodomy performed in private and between consenting adults." 478 U.S. at 193–94, 106 S.Ct. at 2845–46. In the space of three decades half the states decriminalized this conduct, some no doubt in deference to the

position taken by the American Law Institute in the Model Penal Code, Sec. 213.2:

"Section 213.2 of the Model Code makes a fundamental departure from prior law in excepting from criminal sanctions deviate sexual intercourse between consenting adults." American Law Institute, Model Penal Code and Commentaries, Part II, 1980 Ed., pp. 362–63.

"The usual justification for laws against such conduct is that, even though it does not injure any identifiable victim, it contributes to moral deterioration of society. One need not endorse wholesale repeal of all 'victimless' crimes in order to recognize that legislating penal sanctions solely to maintain widely held concepts of morality and aesthetics is a costly enterprise. It sacrifices personal liberty, not because the actor's conduct results in harm to another citizen but only because it is inconsistent with the majoritarian notion of acceptable behavior. In the words of the Wolfenden Report, the decisive factor favoring decriminalization of laws against private homosexual relations between consenting adults is 'the importance which society and the law ought to give to individual freedom of choice and action in matters of private morality.'" *Id.* at 371–72.

Two states by court decisions hold homosexual sodomy statutes of this nature unconstitutional for reasons similar to those stated here: New York in *People v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980); and Pennsylvania in *Commonwealth v. Bonadio,* 490 Pa. 91, 415 A.2d 47 (1980). There are two other states where lower courts have ruled such statutes unconstitutional: *Texas v. Morales,* 826 S.W.2d 201 (Texas App.—Austin 1992); *Michigan Organization for Human Rights v. Kelly,* No. 88–815820(CZ) (Wayne County Circuit Court, July 9, 1990). Thus our decision, rather than being the leading edge of change, is but a part of the moving stream.

The *Bonadio* case from Pennsylvania is particularly noteworthy because of the common heritage shared by the Kentucky Bill of Rights of 1792 and the Pennsylvania Bill of Rights of 1790. Decisions of the Pennsylvania Supreme Court interpreting like clauses in the Pennsylvania Constitution are uniquely persuasive in interpreting our own. It is a singular coincidence that in 1980 the Pennsylvania Supreme Court reached to the same roots in interpreting its Constitution as our Court did in the *Campbell* case, quoting at length from the "great philosopher, John Stuart Mill, in his imminent and apposite work, *On Liberty* (1859)," and utilizing the *same* quotes. *Id.* at 50. The Pennsylvania Court also provides this guidance:

"With respect to regulation of morals, the policy power should properly be exercised to protect each individual's right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct *does not harm others.* 'No harm to the secular interest of the community is involved in atypical sex practice in private between consenting adult partners.'" *Model Penal Code,* Sec. 207.5–Sodomy and Related Offenses. Comment (tent. draft no. 4, 1955).

"Many issues that are considered to be matters of morals are subject to debate, and no significant state interest justifies legislation of norms simply because a particular belief is followed by a number of people, or even a majority.... Enactment of the voluntary deviate sexual intercourse statute, despite that it provides punishment for what many believe to be abhorrent crimes against nature and perceived sins against God, is not proper in the realm of the temporal police power."

The Commonwealth has cited *State v. Walsh,* 713 S.W.2d 508 (Mo.1986), wherein the Missouri Supreme Court rejected a constitutional challenge to a statute similar to ours criminalizing homosexual intercourse. The Missouri court states "[t]he issue is whether the Fourteenth Amendment to the United States Constitution prohibits the state from proscribing homosexual conduct." *Id.* at 509. No state constitutional law issues were raised in the *Walsh* case. The Court addressed federal law only and simply followed in lock step the decision of the United States Supreme Court in *Bow-*

*ers v. Hardwick.* It then undertook an equal protection analysis also based solely on its view of federal equal protection law, again silent as to the Missouri Constitution. We find nothing in the *State v. Walsh* opinion that provides appropriate guidance for us.

## II. EQUAL PROTECTION

As stated earlier, in *Bowers v. Hardwick, supra,* the Equal Protection Clause was not implicated because the Georgia statute criminalized both heterosexual and homosexual sodomy. Unlike the Due Process Clause analysis provided in *Bowers v. Hardwick,* equal protection analysis does *not* turn on whether the law (KRS 510.100), transgresses "liberties that are 'deeply rooted in this Nation's history and tradition.'" 478 U.S. at 191–92, 106 S.Ct. at 2844–45.

In *Watkins v. U.S. Army,* 875 F.2d 699 (9th Cir.1989), involving the constitutionality of an Army regulation which made homosexuality a nonwaivable disqualification for reenlistment, Judge Norris, concurring in the judgment, explained the difference between Due Process Clause analysis and Equal Protection Clause analysis, as follows:

"The due process clause, as the Court recognized in *Hardwick,* protects practices which are 'deeply rooted in this Nation's history and tradition.' The Equal Protection Clause, in contrast, protects minorities from discriminatory treatment at the hands of the majority. Its purpose is not to protect traditional values and practices, but to *call into question* such values and practices when they operate to burden disadvantaged minorities.... [Emphasis original.]

The Equal Protection Clause, by contrast ... protect[s] disadvantaged groups from discriminatory practices, however deeply ingrained and long-standing." *Id.,* 875 F.2d at 718.

Further explaining:

"It is perfectly consistent to say that homosexual sodomy is not a practice so deeply rooted in our traditions as to merit due process protection, and at the same time to say, for example, that because homosexuals have historically been subject to invidious discrimination, laws which burden homosexuals as a class should be subjected to heightened scrutiny under the equal protection clause. Indeed, the two propositions may be complimentary: In all probability, homosexuality is not considered a deeply-rooted part of our traditions *precisely because* homosexuals have historically been subjected to invidious discrimination. In any case, homosexuals do not become 'fair game' for discrimination simply because their sexual practices are not considered part of our mainstream traditions." *Id.* at 719. [Emphasis original.]

....

"This principle of equal treatment, when imposed against majoritarian rule, arises from the Constitution itself, not from judicial fiat. Moreover, equal protection doctrine does not prevent the majority from enacting laws based on its substantive value choices. Equal protection simply requires that the majority apply its values evenhandedly." *Id.* at 720.

Certainly, the practice of deviate sexual intercourse violates traditional morality. But so does the same act between heterosexuals, which activity is decriminalized. Going one step further, *all* sexual activity between consenting adults outside of marriage violates our traditional morality. The issue here is not whether sexual activity traditionally viewed as immoral can be punished by society, but whether it can be punished solely on the basis of sexual preference.

The Commonwealth's argument against permitting sexual behavior preferred by homosexuals the protection of the Equal Protection Clause has centered solely on denying homosexuals status as a protected class, claiming society has a right to discriminate so long as such discrimination is not race related or gender related and this law punishes the act and not the preference of the actor. In *American Constitutional Law,* 2d ed. 1988, Laurence H. Tribe, p. 1616, the author answers the Commonwealth's claims:

"Not only is the characteristic of homosexuality or heterosexuality central to the personal identities of those singled out by laws based on sexual orientation, but homosexuals in particular seem to satisfy all of the Court's implicit criteria of suspectness. As subjects of age-old discrimination and disapproval, homosexuals form virtually a discrete and insular minority. Their sexual orientation is in all likelihood 'a characteristic determined by causes not within [their] control (noting *Mathews v. Lucas,* 427 U.S. 495, 505 [96 S.Ct. 2755, 2762, 49 L.Ed.2d 651] (1976), describing illegitimacy),' and is, if not immutable, at least 'extremely difficult to alter (noting 'The Constitutionality of Laws Forbidding Private Homosexual Conduct,' 72 Mich.L.Rev. 1613, 1626 (1974))."

Professor Tribe's view is fully supported, not only by his own documentation, but by the testimony of record in this case and by the medical, scientific and social science data provided in the briefs filed herein by Amici Curiae. The truth is, one's sexual partner is chosen usually, if not exclusively, based on sexual orientation. We cannot deny the evidence before us in analyzing how our state constitution should apply.

■ We do not speculate on how the United States Supreme Court as presently constituted will decide whether the sexual preference of homosexuals is entitled to protection under the Equal Protection Clause of the Federal constitution. We need not speculate as to whether male and/or female homosexuals will be allowed status as a protected class if and when the United States Supreme Court confronts this issue. They are a separate and identifiable class for Kentucky constitutional law analysis because no class of persons can be discriminated against under the Kentucky Constitution. All are entitled to equal treatment, unless there is a substantial governmental interest, a rational basis, for different treatment. The statute before us is in violation of Kentucky constitutional protection in Section Three that "all men (persons), when they form a social compact, are equal," and in Section Two that "abso-

lute and arbitrary power over the lives, liberty and property of free men (persons) exist nowhere in a republic, not even in the largest majority." We have concluded that it is "arbitrary" for the majority to criminalize sexual activity solely on the basis of majoritarian sexual preference, and that it denied "equal" treatment under the law when there is no rational basis, as this term is used and applied in our Kentucky cases.

In *Tabler v. Wallace,* Ky., 704 S.W.2d 179 (1986), we applied the Kentucky Constitution to strike down a statute creating a statute of repose for persons engaged in the construction industry. Addressing the equal protection provisions found in Kentucky Constitution Sections Two and Three, as enhanced by Sections 59 and 60, we stated:

"[T]he Kentucky Constitution ... is much more detailed and specific than the equal protection clause of the Federal Constitution." *Id.* at 183.

. . . .

"The fundamental question is whether the General Assembly has a reasonable basis for this legislation sufficient to justify creating a separate classification for certain persons...." *Id.* at 185.

More recently, in *Perkins v. Northeastern Log Homes,* Ky., 808 S.W.2d 809, 818 (1991), we stated:

"Many [states] have general protection against 'arbitrary power' as we have in Kentucky Constitution § 2, and guarantees of 'equal' rights and protection against 'grant' of 'separate ... privileges' as we have in Kentucky Constitution § 3. But few have additional protection against local and special legislation as we have in Kentucky Constitution § 59. So far as we can determine, none has anything like the combination of broad constitutional protection of individual rights against legislative interference vouchsafed by our 1891 Kentucky Constitution."

Section 59 denies the General Assembly the power to "pass local or special acts ... Fourth: to regulate the punishment of crimes and misdemeanors." Kentucky

adopted the Model Penal Code in 1974, including its sections on deviate sexual intercourse, and then engrafted upon it a "special act" punishing consensual deviate sexual activity only of persons of the same sex. We do not condone the immorality of such activity when we recognize that this is punishing people because they are different rather than because of what they are doing.

In *Tabler v. Wallace, supra,* we stated: "A number of different reasons have been suggested by the defendants and those filing amicus curiae briefs on their behalf for creating a separate classification for these groups. But these are offered only as possible reasons that could have existed, not as reasons that did in fact exist. The justifications offered are largely self-contradictory." 704 S.W.2d at 185.

The Commonwealth has tried hard to demonstrate a legitimate governmental interest justifying a distinction, but has failed. Many of the claimed justifications are simply outrageous: that "homosexuals are more promiscuous than heterosexuals, ... that homosexuals enjoy the company of children, and that homosexuals are more prone to engage in sex acts in public." The only proffered justification with superficial validity is that "infectious diseases are more readily transmitted by anal sodomy than by other forms of sexual copulation." But this statute is not limited to anal copulation, and this reasoning would apply to male-female anal intercourse the same as it applies to male-male intercourse. The growing number of females to whom AIDS (Acquired Immune Deficiency Syndrome) has been transmitted is stark evidence that AIDS is not only a male homosexual disease. The only medical evidence in the record before us rules out any distinction between male-male and male-female anal intercourse as a method of preventing AIDS. The act of sexual contact is not implicated, per se, whether the contact is homosexual or heterosexual. In any event, this statute was enacted in 1974 before the AIDS nightmare was upon us. It was 1982 or 1983 before AIDS was a recognized diagnostic entity.

In the final analysis we can attribute no legislative purpose to this statute except to single out homosexuals for different treatment for indulging their sexual preference by engaging in the same activity heterosexuals are now at liberty to perform. By 1974 there had already been a sea change in societal values insofar as attaching criminal penalties to extramarital sex. The question is whether a society that no longer criminalizes adultery, fornication, or deviate sexual intercourse between heterosexuals, has a rational basis to single out homosexual acts for different treatment. Is there a rational basis for declaring this one type of sexual immorality so destructive of family values as to merit criminal punishment whereas other acts of sexual immorality which were likewise forbidden by the same religious and traditional heritage of Western civilization are now decriminalized? If there is a rational basis for different treatment it has yet to be demonstrated in this case. We need not sympathize, agree with, or even understand the sexual preference of homosexuals in order to recognize their right to equal treatment before the bar of criminal justice.

To be treated equally by the law is a broader constitutional value than due process of law as discussed in the *Bowers* case. We recognize it as such under the Kentucky Constitution, without regard to whether the United States Supreme Court continues to do so in federal constitutional jurisprudence. "Equal Justice Under Law" inscribed above the entrance to the United States Supreme Court, expresses the unique goal to which all humanity aspires. In Kentucky it is more than a mere aspiration. It is part of the "inherent and inalienable" rights protected by our Kentucky Constitution. Our protection against exercise of "arbitrary power over the ... liberty ... of freemen" by the General Assembly (Section Two) and our guarantee that all persons are entitled to "equal" treatment (in Section Three) forbid a special act punishing the sexual preference of homosexuals. It matters not that the same act committed by persons of the same sex is

more offensive to the majority because Section Two states such "power ... exists nowhere in a republic, not even in the largest majority."

The purpose of the present statute is not to protect the marital relationship against sexual activity outside of marriage, but only to punish one aspect of it while other activities similarly destructive of the marital relationship, if not more so, go unpunished. Sexual preference, and not the act committed, determines criminality, and is being punished. Simply because the majority, speaking through the General Assembly, finds one type of extramarital intercourse more offensive than another, does not provide a rational basis for criminalizing the sexual preference of homosexuals.

For the reasons stated, we affirm the decision of the Fayette Circuit Court, and the judgment on appeal from the Fayette District Court.

STEPHENS, C.J., and COMBS, LEIBSON and SPAIN, JJ., concur.

COMBS, J., concurs by separate opinion in which STEPHENS, C.J., joins.

LAMBERT, J., dissents by separate opinion in which REYNOLDS, J., joins.

WINTERSHEIMBER, J., dissents by separate opinion in which REYNOLDS, J., concurs in results only.

COMBS, Justice, concurring.

I concur in the majority opinion unreservedly. By writing separately, I intend to detract nothing from this historic monument to freedom, liberty, and equality—the birthright of every citizen of Kentucky. In form and substance, the majority opinion is of a stature entirely commensurate with its noble purpose.

Of necessity, we choose today between competing principles of political, jurisprudential, and (some would say) moral philosophy. Sworn to uphold and protect the Constitution of Kentucky, we seven aspire to perform that high duty, each to the best of his ability, each confessing to finite wisdom.

It is essential to understand what the Constitution is, and what it is not. It is the instrument by which the people created a government and invested it with certain powers, directed to a specific end. The Constitution does not create any rights of, or grant any rights to, the people. It merely recognizes their primordial rights, and constructs a government as a means of protecting and preserving them. In the Bill of Rights, purposed to recognize and establish "the great and essential principles of liberty and free government," the very first section of the Constitution acknowledges that, by virtue of their species and nothing more, all persons are free and equal, and possess certain natural, inherent, inalienable rights. These include, but are not limited to, the enjoyment of life and liberty, the pursuit of happiness, and freedom of expression. In Section 5, freedom of conscience is recognized as another of these ascendant principles.

The purpose of the government born of the Constitution is to protect these individual liberties, not to take them away. The first sentence of the Constitution, the Preamble, declares its object to secure civil, political, and religious liberties. The Constitution does not establish an omnipotent government which may, condescending, dispense selected rights to the citizen. The legislative power vested in the General Assembly through Section 29 is not absolute power, but a power of government (Section 27), a government instituted to ensure the "peace, safety, and happiness" of the people, in whom all power inheres (Section 4). Ordained as the jealous guardian of individual freedom, government wields legitimate power only in execution of that function. Its authority to interfere with one's liberty derives solely from its duty to preserve the liberty of another. Where one seeks happiness in private, removed from others (indeed unknown to others, absent prying), and where the conduct is not relational to the rights of another, state interference is per se overweening, arbitrary, and unconstitutional.

It may be asked whether a majority, believing its own happiness will be enhanced by another's conformity, may not

enforce its moral code upon all. The answer is that, first, morality is an individual, personal—one might say, private—matter of conscience, and dwells inviolate within the fortress of Section 5: "No human authority shall, in any case whatever, control or interfere with rights of conscience." Second, the Constitution promotes no particular morality, however popular. Indeed, the New World having been sought out by those fleeing state and/or majoritarian persecution, our systems of government are predicated upon such imperatives as that recognized in Kentucky Constitution Section 2: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." Third, morality is a matter of values. Insofar as it comprises a moral code, the Constitution embraces— yea, embodies—the immutable values of individual freedom, liberty, and equality.

Those who decry today's result are quick to note the absence of the word "privacy" from the Constitution. To them I say, first, that Section 1, in enumerating certain inherent rights, does not purport to be exclusive. Its words are that those may be reckoned *among* every person's inalienable rights. The Constitution also omits mention of one's right to play checkers, to smile or frown, to rise or rest, to eat or fast, to look at a king. I have no doubt, as a citizen or as a jurist, that these rights exist. (Likely, neither is this list exhaustive.) Second, the right to privacy is a necessary concomitant to general natural freedom and freedom of conscience, as well as to the rights to enjoy life and liberty and to seek and pursue happiness. Third, given the nature, the purpose, the promise of our Constitution, and its institution of a government charged as the conservator of individual freedom, I suggest that the appropriate question is not "Whence comes the right to privacy?" but rather, "Whence comes the right to deny it?"

STEPHENS, C.J., joins in this concurring opinion.

1. Leviticus 20:13; Romans 1:26–27.

LAMBERT, Justice, dissenting.

The issue here is not whether private homosexual conduct should be allowed or prohibited. The only question properly before this Court is whether the Constitution of Kentucky denies the legislative branch a right to prohibit such conduct. Nothing in the majority opinion demonstrates such a limitation on legislative prerogative.

To justify its view that private homosexual conduct is protected by the Constitution of Kentucky, the majority has found it necessary to disregard virtually all of recorded history, the teachings of the religions most influential on Western Civilization[1], the debates of the delegates to the Constitutional Convention, and the text of the Constitution itself. Rather than amounting to a decision based upon precedent as is suggested, this decision reflects the value judgment of the majority and its view that public law has no right to prohibit the conduct at issue here.

**The majority concedes that " 'proscriptions against that conduct [sodomy] have ancient roots.'** 478 U.S. at 192 [106 S.Ct. at 2844]." It fails, however, to describe the depth of such roots as was done in *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986):

> "Sodomy was a criminal offense at common law which was forbidden by the laws of the original 13 States when they ratified the Bill of Rights." 478 U.S. at 192, 106 S.Ct. at 2844.

In his concurring opinion in *Bowers*, Chief Justice Burger elaborated upon the historical condemnation of sodomy as follows:

> "Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western Civilization. Condemnation of those practices is firmly rooted in Judeao–Christian moral and ethical standards. Homosexual sodomy was a capital crime under Roman law. During the English Reformation when powers of the ecclesiastical courts were transferred to the King's Courts, the first English statute criminalizing sodomy was passed.

Blackstone described 'the infamous crime against nature' as an offense of 'deeper malignity' than rape, a heinous act 'the very mention of which is a disgrace to human nature' and 'a crime not fit to be named.' ... To hold that the act of homosexual sodomy is somehow protected as a fundamental right would be to cast aside millennia of moral teaching." 478 U.S. at 196–197, 106 S.Ct. at 2846–47. (Citations omitted.)

The history and traditions of this Commonwealth are fully in accord with the Biblical, historical and common law view. Since at least 1860, sodomy has been a criminal offense in Kentucky and this fact was well known to the delegates at the time of the 1890 Constitutional Convention.

Embracing "state constitutionalism," a practice in vogue among many state courts as a means of rejecting the leadership of the Supreme Court of the United States, the majority has declared its independence from even the influence of this nation's highest court. The majority cannot, however, escape the logic and scholarship of *Bowers* which reached the conclusion that nothing in the Due Process Clause of the United States Constitution prevented a state from punishing sodomy as a crime. While I do not advocate the view that state courts should march in lock step with the Supreme Court of the United States, on those occasions when state courts depart from that Court's reasoned interpretations, it should be for compelling reasons, usually text or tradition, and only in clearly distinguishable circumstances, none of which are present here.

**The majority also concedes that the debates of the Kentucky Constitutional Convention of 1890 contain no mention of a right of privacy or a right to engage in homosexual sodomy.** It rationalizes this fact by indicating that the concept was not articulated until publication of an article by Warren and Brandeis in the Harvard Law Review on December 15, 1890. According to the majority, the delegates to

the Constitutional Convention intended to create such a right but lacked the verbal skills to devise a phrase so complicated as "right of privacy." [2] For whatever reason, the debates contain only the most limited and inexplicit reference to any concept which could be translated into privacy.

Perhaps the greatest mischief to be found in the majority opinion is in its discovery of a constitutional right which lacks any textual support. The majority has referred generally to the twenty-six sections in the Bill of Rights of the Kentucky Constitution and quoted § 1 First and Third and § 2. None of the sections cited or quoted contain an inkling of reference to rights of privacy or sexual freedom of any kind. **This is conceded by the majority as follows: "No language specifying 'rights of privacy,' as such, appears in either the Federal or State Constitution."** The majority opinion is a departure from the accepted methodology of constitutional analysis which requires that text be the beginning point. *Kentucky State Board, Etc. v. Rudasill,* Ky., 589 S.W.2d 877 (1979). The majority reasons that differences between the text of the Kentucky Constitution and the United States Constitution free this Court from federal influence, but it fails to explain its discovery of the rights announced here in the absence of any textual basis. This is a dangerous practice. When judges free themselves of constitutional text, their values and notions of morality are given free rein and they, not the Constitution, become the supreme law. Justice White cautioned against this practice in *Bowers v. Hardwick, supra,* as follows:

"The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." 478 U.S. at 194, 106 S.Ct. at 2846.

As has been demonstrated, a right of privacy protecting homosexual sodomy between or among consenting adults has no

---

**2.** The view of the majority is particularly curious since this Court said in *Kentucky State Board, Etc. v. Rudasill,* Ky., 589 S.W.2d 877, 880 (1979), that "[i]t is generally recognized that the

convention of 1890 was comprised of competent and educated delegates who were sincerely concerned with individual liberties."

basis in the history and traditions of Western culture or in this nation or state. Likewise, the constitutional debates contain only the most oblique references to any right of privacy and Kentucky constitutional text is totally silent. As such, the majority must and does rest its entire case on a line of decisions rendered by this Court in the early twentieth century in which a right of privacy was held to exist with respect to the consumption of alcoholic beverages and the use of tobacco products. The leading decision of this genre is *Commonwealth v. Campbell*, 133 Ky. 50, 117 S.W. 383 (1909), in which a statute which criminalized the possession of intoxicating liquor for private use was held unconstitutional and which, with rhetorical flourish declared the broadest possible right of privacy.

As the majority relies entirely on the doctrine of *stare decisis*, brief comment on its use in the context of constitutional interpretation is appropriate. When courts construe statutes or principles of common law, error in such construction is subject to correction by the people through their elected representatives. With constitutional interpretation, however, such correction is not possible. As only the highest court of a jurisdiction possesses power to say finally what the constitution means (save the right of the people to amend it), courts have a duty to continually re-examine their prior constitutional interpretations to prevent perpetuation of error. Thus, the doctrine of *stare decisis* lacks the vigor in the arena of constitutional law that it possesses in other fields. *Harmelin v. Michigan*, 501 U.S. ——, ——, 111 S.Ct. 2680, 2686, 115 L.Ed.2d 836, 846 (1991). A well known exponent of this view was Justice Brandeis, who said:

> "The Court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 407–408, 52 S.Ct. [443] 445 [447–48], 76 L.Ed. 815 (1932) (Brandeis, J., dissenting).

The fact that this Court broadly declared a right of privacy prior to World War I in cases which one suspects were influenced by local economic forces does not mean that such a doctrine should be applied in the extreme nearly a century later to a moral question not remotely considered by the *Campbell* court.

The major premise in the majority opinion is that the Constitution forbids any legal restriction upon the private conduct of adults unless it can be shown that such conduct is harmful to another. This view represents the essence of the philosophy of John Stuart Mill in his essay *On Liberty*. While espousing such a view, however, Mill recognized the difficulty of distinguishing that part of a person's life which affected only himself from that which affected others. He recognized that one who by deleterious vices harmed himself indirectly harmed others and that society suffered indirect harm by the mere knowledge of immoral conduct. Nevertheless, Mill clung to his philosophy by insisting that society was without power to punish gambling or drunkenness. He made a ringing defense of the right of persons so disposed to practice polygamy.

While the philosophy of John Stuart Mill as adopted by this Court in *Campbell v. Commonwealth, supra*, exalts individuality in the extreme, it has, nevertheless, a superficial appeal. It rejects majoritarian morality as a basis for law and imposes legal limits on the conduct of man only insofar as it may harm others. Unfortunately for the purposes of the majority, the philosophy of Mill and the views contained in the *Campbell* case, if logically applied, would necessarily result in the eradication of numerous other criminal statutes. For example, if majoritarian morality is without a role in the formulation of criminal law and the only standard is harm to another, all laws proscribing the possession and use of dangerous or narcotic drugs would fall. Likewise, incest statutes which proscribe sexual intercourse between persons of close kinship regardless of age or consent would be rendered invalid. Laws prohibiting cruelty to animals, the abuse of dead human bodies, suicide and polygamy would

be held unconstitutional. Despite the majority's disingenuous departure from Mill based on "an enlightened paternalism" to prevent self-inflicted harm, many prevailing criminal statutes would nevertheless fail the "harm to another" test. While the majority of this Court manifestly sees the proposition otherwise, the Supreme Court of the United States has addressed the role of morality as a rationale to support criminal law and found no impediment.

> "The law, however, is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." *Bowers, supra,* 478 U.S. at 196, 106 S.Ct. at 2846.

The majority has characterized Kentucky's highest Court of the early twentieth century as being "in the forefront in recognizing the right of privacy." It has quoted laudable phrases such as " '[t]he fundamental rights of personal security and personal liberty, include the right of privacy, the right to be left alone.... The right to enjoy life in the way most agreeable and pleasant....' " It has created an impression that this Court of that era was filled with enlightened jurists who sought to elevate mankind. Unfortunately, there is a darker side to this Court's past as evidenced by a decision rendered just three years prior to the *Campbell* case. In *Berea College v. Commonwealth,* 123 Ky. 209, 94 S.W. 623 (1906), Judge O'Rear, writing for this Court, enthusiastically upheld the constitutionality of a statute which prohibited "white and colored persons from attending the same school." The Court said:

> "The natural separation of the races is therefore an undeniable fact, and all social organizations which lead to their amalgamation are repugnant to the law of nature. From social amalgamation it is but a step to illicit intercourse, and but another to intermarriage.... When, therefore, we declare a right to maintain separate relations, so far as is reasonably practicable, but in a spirit of kindness and charity, and with due regard to equality of rights, it is not prejudice, nor caste, nor injustice of any kind, but simply to suffer men to follow the law of races established by the Creator himself, and not to compel them to intermix contrary to their instincts." *Id.* at 94 S.W. 628.

A cursory reading of *Berea College v. Commonwealth* will convincingly dispel any notion of social enlightenment on the part of this Court's justices during the first decade of the twentieth century.

The majority opinion relies on the supposed "direct, firsthand knowledge of the mind set of the constitutional fathers" possessed by this Court's justices of the early twentieth century. The views expressed in *Commonwealth v. Campbell* and other decisions of its era are presented as amounting to a contemporaneous construction of the Constitution. The majority has also cited *Commonwealth v. Poindexter,* 133 Ky. 720, 118 S.W. 943 (1909), and disclosed that in 1909 it affirmed the dismissal of a sodomy indictment. What the majority failed to say about the *Poindexter* case is that the indictment was dismissed because the facts alleged did not constitute a crime as the statute was then written. Notably absent from the majority's discussion of *Poindexter* is any disclosure of the Court's view of the act of sodomy. Whatever "rich and compelling tradition of recognizing and protecting individual rights" the Court may have had, it did not recognize a right to engage in sodomy. The *Poindexter* court said:

> "We must confess that we are unable to see what the act [the insertion of the private part of one into the mouth of the other and thereby producing an emission] with which appellees stand charged is not as much a crime against nature as if done in the manner sodomy is usually committed; but as the only authorities we have been able to discover decide otherwise, we regard it our duty to follow precedent, and for this reason alone we hold that the circuit court properly held the indictment bad, and dismissed it. *It is to be hoped, however, that the Legislature will by proper enactment make such an infamous act as that of which appellees confess themselves*

*guilty a felony and punishable as such." Id.* 118 S.W. at 944. (Emphasis added.)

It would be fanciful to suggest that the Court viewed such conduct as constitutionally protected. The majority has urged contemporaneous construction as indicative of delegates' intent. If this be so, *Commonwealth v. Poindexter* is dispositive.

This dissenting opinion, as it relates to a "right of privacy" under the Constitution of Kentucky could be concluded without further elaboration. As heretofore demonstrated, neither the text nor the Constitutional Debates nor the history and traditions of this Commonwealth provide any basis for concluding that there is a right of privacy so broadly defined as to protect homosexual conduct. Nevertheless, the majority has discovered such a right in this Court's prior decisions. An examination of the cases upon which it relies reveals that the Court used privacy as a means of protecting the right of persons to possess and use intoxicating liquor [3], smoke cigarettes, seek compensation for tortious invasion of privacy, and prevent public disclosure of private facts. In each case, the conduct or interest protected on privacy grounds was deeply entrenched in this Commonwealth's history and traditions. I do not regard these decisions as aberrational, but merely overstated. It was hardly necessary to call upon the writings of John Stuart Mill to justify protection of the right of Kentuckians to drink liquor and smoke cigarettes.

To the extent the majority and appellee rely upon the privacy cases of *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31

L.Ed.2d 349 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court in *Bowers* answered

"... [We] think it evident that none of the rights announced in those cases bears any resemblance to the claimed constitutional right of homosexuals to engage in acts of sodomy.... No connection between family, marriage, or procreation on the one hand and homosexual activity on the other has been demonstrated...." 478 U.S. at 190–191, 106 S.Ct. at 2843–44.

From my study of this case, I have concluded that the privacy right found in the Constitution of Kentucky does not apply to claimed rights not remotely envisioned by the delegates to the Constitutional Convention or reasonably emerging from our history and traditions. As such, the right to determine whether sodomy should be a criminal offense belongs to the people through their elected representatives. We should not deprive the people of that right. As the majority has observed, many states have already decriminalized consensual sodomy.[4] Appellee should take his case to the Kentucky General Assembly and let that branch of government say whether the crime shall remain or be abolished.

To resolve the equal protection issue, one must first review the statute, KRS 510.100. This Act is not limited in its application to persons who consider themselves homosexual nor is it limited to the male or female gender. Any person who engages in deviate sexual intercourse with another person of the same sex is in violation. The statute

3. The majority contends that in *Board of Trustees of town of New Castle v. Scott,* 125 Ky. 545, 101 S.W. 944 (1907), "Chief Justice O'Rear passionately attacked the evil of alcohol" and "notwithstanding their strong views that drinking was immoral ...," the Court upheld the right of possession and consumption on privacy grounds. After a painstaking perusal of the *Scott* case, I am unable to find anything which indicates a view that drinking was immoral or that alcohol was attacked as evil. The *Scott* case attacked the practice of *trafficking* in alcohol and upheld a statute which permitted local regulation. A major premise in the majority

opinion, that despite strong personal views on the evils of alcohol, the Court upheld the right to possess and use it on privacy grounds, is thus invalidated.

4. According to the majority, since 1961, twenty-five states have decriminalized consensual sodomy. Of these, only the states of New York and Pennsylvania have accomplished this by high court decision. Presumably, the remainder have done so by legislative enactment. As such, the "moving stream" referred to by the majority appears to be legislative rather than judicial.

prohibits conduct and says nothing of the sexual preference or gender of the violator. The United States Court of Appeals for the Fifth Circuit found this dispositive in upholding a Texas anti-sodomy statute.

> "The statute is directed at certain conduct, not at a class of people. Though the conduct be the desire of the bisexually and homosexually inclined, there is no necessity that they engage in it. The statute affects only those who choose to act in the manner proscribed." *Baker v. Wade,* 774 F.2d 1285, 1287 (5th Cir.1985), *cert. denied* 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).

There is nothing in the statute by which persons are classified and certainly nothing which accords unequal treatment to persons comprising a recognizable class on factors such as race, gender or ethnic origin. *Burlington Northern Railroad Co. v. Ford,* 504 U.S. ——, 112 S.Ct. 2184, 119 L.Ed.2d 432 (1992).

The heart of the majority contention is that unequal treatment results when the same conduct is deemed criminal if committed by persons of the same sex, but not if the actors are of different sexes. It correctly observes that in former times all sexual contact between unmarried persons was viewed as immoral. From this the majority concludes the statute must be invalidated.

In *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), The Supreme Court addressed this contention:

> "The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' But so too, '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were

the same.' The initial discretion to determine what is 'different' and which is 'the same' resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Id.,* 457 U.S. at 216, 102 S.Ct. at 2394. (Citations omitted.)

As to classifications, this Court held in *Delta Air Lines, Inc. v. Commonwealth, Revenue Cabinet,* Ky., 689 S.W.2d 14 (1985), that the standards are the same under the Kentucky Constitution and the Fourteenth Amendment to the United States Constitution. The opinion also held that

> "The Legislature has a great freedom of classification and the presumption of validity can be overcome only by the most explicit demonstration that it is hostile and oppressive against particular persons and classes." *Id.* at 18.

As persons who engage in homosexual sodomy have never been held to constitute a suspect classification [5], to be upheld, the statute at issue need only satisfy the lowest level of judicial scrutiny and demonstrate that it bears a rational relationship to a legitimate legislative objective. Protection of public "health, safety and morality" was held to be such an objective in *Bosworth v. City of Lexington,* 277 Ky. 90,

---

5. The majority relies upon the views of Professor Laurence H. Tribe in *American Constitutional Law,* 2d ed. 1988, for its contention that homosexuals satisfy the criteria for suspect classification "as subjects of age-old discrimination and disapproval, homosexuals form virtually a discrete and insular minority." Professor Tribe's objectivity is doubtful since he represented respondent Hardwick in the Supreme Court of the United States. No doubt, Tribe's argument quoted in the majority opinion was made in the Supreme Court and rejected.

As to *Watkins v. U.S. Army,* 875 F.2d 699 (9th Cir.1989), the quoted portion in the majority opinion is from a concurring opinion in which only two judges joined. The court, sitting *en banc,* consisted of eleven judges, and a majority decided the case on grounds of administrative law and estoppel and did not reach any constitutional issue. The *Watkins* quotation in this Court's majority opinion is not authority as it does not appear in that court's majority opinion.

125 S.W.2d 995, 1000 (1930). This objective found new vitality with the emergence of the AIDS epidemic which indisputably originated in this country in the homosexual community. Moreover, *Bowers v. Hardwick, supra,* held forthrightly that the rational basis standard was satisfied by majority sentiments as to the immorality of homosexuality. *Id.,* 478 U.S. at 196, 106 S.Ct. at 2846.

In final analysis, the question is whether a rational distinction may be drawn between acts of sodomy committed by heterosexuals and homosexuals. As cases such as *Griswold v. Connecticut, supra, Eisenstadt v. Baird, supra, Loving v. Virginia, supra,* and *Roe v. Wade, supra,* demonstrate, there is a heightened protection of the right of persons with respect to conduct in the context of marriage, procreation, contraception, family relationships, and child rearing and education. As such considerations are without any application as to acts of homosexual sodomy, the distinction is manifest.

"We do not condone the immorality of such activity," says the majority. Despite this statement, it should not be doubted that this decision will be regarded as the imprimatur of Kentucky's highest court upon homosexual conduct. The moral opprobrium of the majority will be lost and the popular perception will be that if the Constitution protects such conduct, it must be okay. While this is not an accurate line of thought, it is a natural one. Those who wish to urge that homosexual conduct is immoral and those who oppose the portrayal of homosexuality as an acceptable alternative lifestyle will encounter the majority opinion as a powerful argument to the contrary. *Cf., Planned Parenthood of Southeastern Pennsylvania v. Robert P. Casey,* — U.S. —, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (Scalia, J. dissenting).

I conclude with the view that this Court has strayed from its role of interpreting the Constitution and undertaken to make social policy. This decision is a vast extension of judicial power by which four Justices of this Court have overridden the will of the Legislative and Executive branches of Kentucky State Government and denied the people any say in this important social issue. No decision cited by the majority has ever gone so far and certainly none comes to mind. Where this slippery slope may lead is anybody's guess, but the ramifications of this decision will surely be profound.

For these reasons, I dissent.

REYNOLDS, J., joins in this dissenting opinion.

WINTERSHEIMER, Justice, dissenting.

I strongly dissent from the majority opinion because it totally misstates the case and proceeds to attack a statute that is not the direct subject of the criminal charge originally made in this case.

The majority opinion asserts that this is a case about privacy and yet it completely ignores that the criminal act for which the defendant was charged was a proposition made to a total stranger on a public street in downtown Lexington, Kentucky. Under such circumstances, there is no reasonable expectation of privacy.

Wasson solicited an undercover Lexington policeman in a parking lot in the Quality Street area to engage in deviate sexual intercourse. The charge against him was the solicitation to commit a criminal offense pursuant to K.R.S. 506.030. Solicitation to commit any crime on a public street in Lexington is simply not a private matter.

The majority opinion quickly departs from the solicitation aspect of the case, claiming it was not preserved, to something it prefers, the privacy issue, which it invented especially for this case.

The majority opinion lacks balance. It recognizes only one aspect of the equation of privacy. Every person is entitled to privacy to the degree that it does not invade the privacy of any other person. For every right there must be a corresponding responsibility. Here, we have a clear clash of rights. The public in general has a right to be free of solicitation from criminal acts and every individual has a right to conduct his or her own affairs.

Courts should not intrude on the individual affairs of any person except to decide matters which are squarely before them. Anything else is strictly an advisory opinion. In addition anything else is still another unwarranted invasion of government in the form of an all-knowing judiciary in the individual affairs of the total community. Judicial time is very precious and there is no reason that this Court should be seeking problems to solve which we make on our own initiative. Apparently the majority opinion could not wait for a proper case but it had to jump into the controversy in order to proclaim its view on the discovery of privacy in Kentucky.

The major premise of the majority opinion is fatally flawed. By any stretch of legal logic, the court should consider the exact charge filed and not create an issue where none exists. Rights may be freely enjoyed and exercised only limited by the degree to which they invade the rights of others to enjoy and exercise their own individual rights. When rights collide in the public arena, a balance must be achieved.

### I. Privacy

Privacy is a marvelous concept but it has been totally distorted by the majority opinion. It is ironic that in the rambling rhetoric of over 9,000 words, the majority opinion blithely tramples on the rights of the majority of the public.

The precise charge here is that there is violation of K.R.S. 510.100, fourth-degree sodomy. The charge involves solicitation rather than the consummation of fourth-degree sodomy. The arrest occurred in 1985 when Wasson was apprehended along with four other individuals. His counsel moved the district court to dismiss the charge on constitutional grounds and asked the court to hold his motion in abeyance until the United States Supreme Court could decide what is now known as *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Counsel noted in his motion that the Georgia sodomy statute being considered in *Bowers, supra,* was remarkably similar and that the forthcoming decision in that case would "most likely

be determinative" of his challenge to the Kentucky sodomy statute. When the *Bowers* decision was released, and it was adverse to the position of the defendant here, he filed a second motion to dismiss and raised questions regarding Sections 2 and 17 of the Kentucky Constitution as well as the Eighth Amendment to the Federal Constitution. His counsel explained that the grounds for his challenge included the right to privacy under the Kentucky Constitution, equal protection and freedom from cruel and unusual punishment.

Fayette District Judge Lewis Paisley refused to allow the county attorney to introduce any treatises on the subject of sodomy. A motion for separation of the defense witnesses was also denied. Seven witnesses testified for the defense. Later, Fayette Circuit Judge Charles M. Tackett affirmed the dismissal of the case on the constitutional grounds of privacy and equal protection. Judge Tackett expressed the opinion that the sexual acts performed by consenting adult homosexuals are necessary for them to enjoy a full and satisfying sexual life.

Although the question of privacy was decided by the majority opinion under Kentucky constitutional provisions, the views of the United States Supreme Court on that question are highly persuasive to anyone who approaches this subject with an intelligent attitude of open-mindedness. The U.S. Supreme Court has determined that the practice of homosexual sodomy is not a right protected by the Federal Constitution. The practice is prohibited in approximately 25 states in the United States and it could hardly be said that there is a consensus that sodomy is a right protected by privacy. There is no evidence that the framers of the Kentucky Constitution intended to confer a greater right to privacy than was already provided by the U.S. Constitution. The debates of the 1890 Constitutional Convention do not suggest any such intent. Consensual homosexual sodomy was outlawed prior to the adoption of the present Kentucky Constitution. Application of the majority opinion will generate a tremendous amount of litigation in other criminal areas and would call into question the va-

lidity of existing statutes and case law dealing with search and seizure questions on the basis of a newly found right to privacy.

The fourth-degree sodomy statute clearly punishes conduct and not a class of people. Obviously, it is an individual's conduct that is the subject of the legislation, and it is the individuals who break the law who are specifically punished. The statute applies to any person regardless of sexual orientation. Homosexuals are not a constitutionally recognizable class for the purposes of an equal protection argument. The standard for determining whether a cognizable class exists consists of immutable characteristics uniformly shared by all class members, who because of such distinctive traits, are given special treatment by the law. Examples of such traits are race, gender and national origin. Sexual preference is not included.

The record in this case contains undisputed testimony by experts presented by the defendant that homosexuals are more promiscuous than heterosexuals; that infectious diseases are more readily transmitted by anal sodomy than by any other form of sexual copulation; and that homosexuals account for 73 percent of all AIDS cases in this country. Clearly the interest of all Kentuckians in protecting public health, safety and morals are at issue. The necessity for controlling such behavior prevails over any equal protection challenge.

This Court is mistaken in determining that the fourth-degree sodomy statute violates a person's right to privacy under the Kentucky Constitution. The Kentucky Constitution as well as the Federal Constitution, does not specifically address the right of privacy. The U.S. Supreme Court has held that certain fundamental rights exist within a zone of privacy implied by the First, Third, Fifth and Ninth Amendments to the Federal Constitution. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The rights granted through these amendments are applicable to the people of Kentucky through the Fourteenth Amendment to the Federal Constitution. The U.S. Supreme Court rec-

ognizes some rights as fundamental. Sodomy is not a fundamental right that would be considered implicit in the concept of ordered liberty. *Cf. Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). It does not enjoy protection under the Federal Constitution. *Bowers*.

There is a long history of laws against sodomy in Kentucky and elsewhere. Of course it has been considered morally wrong since the beginning of time, but this is a secular legal question here. The very word "sodomy" is derived from the biblical name of the city of Sodom which was destroyed by God for its perverse behavior. In 1533, it became a statutory crime in England under King Henry VIII. In the early English colonies, laws were enacted against sodomy which punished the crime by death. 26 William & Mary Law Review, p. 645 (1985).

In *Bowers*, the U.S. Supreme Court, in refusing to extend privacy protection to sodomy reasoned that morality is an acceptable basis for laws against homosexual sodomy and stated that: "The law is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the due process clause, the courts will be very busy indeed." It is foolish and fruitless to ignore morality in our society and in our governmental function. Every political decision of consequence reflects a moral judgment. In response to the oft-heard claim that you can't legislate morality, it needs to be said that legislation is always based on someone's morality. It is based on someone's notion of what is right or wrong, just or unjust, fair or unfair. The claim that we cannot legislate morality is a deception intended to exclude from the democratic process those citizens who frankly acknowledge that their motivation is moral in nature. The majority opinion has reached the conclusion that Kentucky Constitution supports a right of privacy that permits consensual sodomy. The majority opinion treats with favor a federal constitutional analysis which proceeds from so-called "emanations" and "penumbras" in its discussion of the First, Third, Fourth and

**512** ■

Fifth Amendments to the Federal Bill of Rights. "Emanations and penumbras" are more suited to a seance or a psychic experience rather than to a judicial opinion at any level in any court.

The Kentucky cases that the majority opinion bases its discovery of the right of privacy are *Commonwealth v. Campbell*, 133 Ky. 50, 117 S.W. 383 (1909) which recognizes the right to possess liquor for personal use. *Lewis v. Commonwealth*, 197 Ky. 449, 247 S.W. 749 (1915) which follows *Campbell, supra; Hershberg v. City of Barbourville*, 142 Ky. 60, 133 S.W. 985 (1911) which declares a city cigarette ordinance void as being overbroad; *Commonwealth v. Smith*, 163 Ky. 227, 173 S.W. 340 (1915) which also follows *Campbell*, and *Commonwealth v. Vincent*. 282 Ky. 95, 137 S.W.2d 1091 (1940), which involves a wrongful death action and does not mention any provision of the Kentucky Constitution. None of these cases established a sweeping right to privacy under the Kentucky Constitution. For the most part, they address whether the exercise of police power was reasonably necessary to further a legitimate state purpose in a specific context.

The majority opinion seizes upon the *Campbell* decision and ecstatically embraces the philosophy of John Stewart Mill, an English philosopher of the mid–19th Century. Absolute adoption of the philosophy of Mill is not required by the Kentucky Constitution in any respect. Mill and his disciples express a kind of "anything goes" or laissez faire attitude towards what they construe as individual liberty.

Some scholars have observed that the emerging law of privacy has been based on the proposition that society may properly regulate the behavior of competent adults only if that behavior demonstrably threatens the rights, safety or interest of others. John Stuart Mill declared a maxim that "that the individual is not accountable to society for his actions, insofar as these concern the interest of no person but himself." A Michigan court has used this Mill philosophy as the basis of a decision invalidating a statute requiring motorcyclists to wear helmets. The Michigan court found that the law was related only to the safety of the motorcyclist and therefore was invalid. Their decisions are based on outdated philosophical premises. If the Mill concept was ever valid, it has been totally overcome by the development of the interconnection of modern society. If Mill's philosophy that "a man's conduct affects himself alone" was ever true it was not so today. The English–Irish poet, John Dunne, expressed it marvelously when he wrote:

> No man is an island. Ask not for whom the bell tolls, it tolls for you.

No individual is permitted to opt out of any system of comprehensive social legislation even when harm could only come to the individual. If a person lives in society, it is not just the concern of that person whether they can operate a motorcycle safely. The safety of the motorcyclist is directly related to the safety of others using the highway. Contemporary society strongly indicates that the medical bills and the danger to others clearly require precautions that reduce the number of highway accidents.

The influence of John Stuart Mill on the majority opinion requires a careful person to examine the historical background in which Mill developed his philosophies. He is best-known as a teacher of his version of logic. He believed that in order to find the meaning of a proposition, one must first find the meaning of its constituent verbal parts. Some criticize him on the basis of an analysis of meanings derived mainly from the propositional meaning of a word as primary and a meaning of the individual words as derivative. If you apply the Mill concept to liberty, as mere mortals ordinarily understand it, it results in little more than a modern hedonism. Mill was an empiricist. He believed that a proposition is significant only if it describes what has been or could be experienced.

The majority opinion selects Mill's essay "On Liberty" as its polestar. In that work Mill's purpose was to persuade that each adult should have a private sphere of individual liberty comprised of any of his acts that do not affect prejudicially the interests of others. Clearly, almost any act that a

person performs may affect prejudicially the interests of others. Mill argues against what he calls the moral coercion of public opinion in order to enforce any degree of conformity. He does not specifically recognize the conflict between liberty interests among individuals.

Mill lived at a time when the influence of his own father, James Mill, Jeremy Bentham, David Ricardo and John Austin were triumphant in extolling the virtue of the philosophy of utilitarianism. Clearly, his view was rights without any corresponding responsibility. The responsibility of government and specifically the judiciary to balance the rights of individuals when they collide was not effectively discussed by Mill or his followers.

Generally, liberty can be defined as an exception from unnecessary restrictions. The two types of liberty are moral liberty and legal or political liberty.

Moral liberty means the power of a person to make choices about right and wrong or good and evil. In this way, a person can form their own opinions and guide their own conduct. Political or legal liberty is freedom guaranteed by law. It provides the means for each person to become their own master. Political liberty protects the individual from the unnecessary and arbitrary intrusion and power of government.

Utilitarianism maintains that the rightness of an action can be judged on its own contribution to the general welfare and that human pleasure is the only thing good in itself and pain the only thing evil in itself. It is a form of hedonism which was developed by Bentham and others who derived their theories from Hobbs, Locke and Hume.

John Stuart Mill claims that the rightness or wrongness of any individual act is based on its conformity to transient precepts of human conduct, all measured by subjective overall utility.

The reliance of the majority opinion on cases such as *Campbell, Smith, Lewis, Hershberg* and *Vincent* is completely misplaced, and the conclusion the majority opinion reaches is strained. Other decisions of this Court in the more modern era

indicate an unwillingness to engage in random revision of the Kentucky Constitution by judicial fiat. *See Estep v. Commonwealth*, Ky., 663 S.W.2d 213 (1983) in which it is held that Section 10 of the Kentucky Constitution provides no greater protection than does the Federal Fourth Amendment; *Jordan v. Commonwealth*, Ky., 703 S.W.2d 870 (1985) which provides that Section 13 of the Kentucky Constitution affords no greater protection than does the Federal Fifth Amendment; *Commonwealth v. Willis*, Ky., 716 S.W.2d 224 (1986) which indicates that Section 11 of the Kentucky Constitution provides no greater protection than does the Federal Sixth Amendment and *Delta Airlines, Inc. v. Commonwealth, Revenue Cabinet*, Ky., 689 S.W.2d 14 (1985) which holds that the standards for classification under the Kentucky Constitution are the same as those under the Fourteenth Amendment to the Federal Constitution.

*Commonwealth v. Foley*, Ky., 798 S.W.2d 947 (1990) provides that Section 1(4) of the Kentucky Constitution gives no more protection than does the Federal First Amendment; *Tabler v. Wallace*, Ky., 704 S.W.2d 179 (1985) notes that Sections 1, 2 and 3 of the Kentucky Constitution suffice to embrace the Equal Protection Clause of the Federal Fourteen Amendment; *Cain v. Commonwealth*, Ky., 556 S.W.2d 902 (1977) announces that the right of counsel guaranteed by Section 11 of the Kentucky Constitution is no greater than the right of counsel in the Federal Sixth Amendment; *Glasson v. Tucker*, 477 S.W.2d 168 (1972) holds that Section 1 of the Kentucky Constitution is coterminous with the Federal First Amendment; *Ray v. City of Owensboro*, Ky., 415 S.W.2d 77 (1967) states that Section 1(5) of the Kentucky Constitution is coterminous with the Equal Protection Clause of the Federal Fourteenth Amendment. *Rawlings v. Butler*, Ky., 290 S.W.2d 801 (1956) states that Sections 1 and 5 of the Kentucky Constitution are coterminous with the religious clauses of the Federal First Amendment; *Fischer v. Grieb*, 272 Ky. 166, 113 S.W.2d 1139 (1938) holds that Section 3 of the Kentucky Con-

stitution is interchangeable with the Equal Protection Clause of the Federal Fourteenth Amendment. *Commonwealth v. Ashcraft*, Ky.App., 691 S.W.2d 229 (1985) held that the Federal First Amendment actually provided more free speech rights than does the Kentucky Constitution.

Reference by the majority opinion to the debates of the 1890 constitutional convention are distorted. The four-volume, six thousand page set of the debates contains no indication that the framers of the 1891 Kentucky Constitution intended to expand in any way the privacy rights already provided by the Federal Constitution. *See Index to the Official Report of the Proceedings and Debates of the Convention*, (Legislative Research Commission, June 1989).

The 1890 constitutional convention delegates were undoubtedly well aware of the 1860 Kentucky statute which provided: "Whoever shall be convicted of the crime of sodomy or buggery with man or beast, he shall be confined in the penitentiary for not less than two nor more than five years." K.R.S. Chapter 28, Art. IV, § 11 (1860). If the drafters of the current Kentucky Constitution in 1890 had been concerned with providing protection for such activities, they certainly would have made some mention of such a desire.

The majority opinion has invented a new fundamental right of consensual sodomy under a claim of discovery of a privacy right. It has clothed it with greater constitutional sanctity. Certainly Kentucky is free to confer greater rights on its citizens, but we must consider that in doing so it is first an obligation or responsibility of the General Assembly to take such action. When we speak of the rights of citizens, we must include all citizens, not just those citizens who are accused of criminal acts. The decent law abiding citizens of Kentucky are entitled to equal protection of the law as well as privacy and such a right must be recognized, not only by the legislature but also this Court. *Bowers* stated in part that "A reviewing court should strive to assure itself and the public that announcing rights not readily identifiable in the text of a constitution involves much more than the imposition of the justices' own choice of values." Here, the majority opinion imposes its choice of values and has completely failed to understand or correctly analyze the constitutional principles upon which it based its choice.

The majority opinion is based on the theory that government may not interfere with those acts done in private that do not adversely affect others. Such a view cannot be applied consistently and neutrally. It can be easily argued that this decision could result in constitutional protection being claimed for the private use of cocaine, consensual incest, suicide and prostitution. Obviously solicitation to commit prostitution is very close to solicitation for deviate sexual intercourse. It is incumbent upon any court to adopt and apply neutral and consistent principles when deciding constitutional issues involving moral and ethical decisions of a general nature which affect all the citizens of a community or state.

Kentucky has already established the standards for deciding state constitutional issues in *Kentucky State Board for Elementary and Secondary Education v. Rudasill*, Ky., 589 S.W.2d 877 (1979). In that case a four-part criteria was adopted. The Court should examine 1) the text of the constitution; 2) the intent of the framers; 3) a comparison of the state constitutional provision to the federal counterpart and 4) the court must analyze how prior judicial opinions interpreted the constitutional provisions in question. If these factors were applied in the majority opinion, it could not have found a fundamental constitutional right to engage in consensual sodomy.

The people have the right to decide what are constitutional rights and what are not. The people directly elect their legislatures and a sufficient mechanism is provided to amend and add to the Kentucky Constitution.

Any proper respect for the division and separation of powers in the Kentucky system of government recognizes that it is the responsibility of the Kentucky legislature to decide the propriety of criminalizing potential sodomy.

I find no authority for this Court to announce a fundamental constitutional right by discovery. In *Surrogate Parenting Associates, Inc. v. Commonwealth*, Ky., 704 S.W.2d 209 (1986) Justice Leibson, writing for the majority, stated that "Our Kentucky Constitution empowers the legislative branch, but not the judicial branch, of government to articulate public policy regarding health and welfare." Although I dissented from that opinion on other grounds, Justice Leibson was right in announcing that policy but is wrong in the majority opinion at this time. *Walters v. Bindner*, Ky. 435 S.W.2d 464 (1968), stated that the legislature has broad discretion to determine for itself what is harmful to health and morals or what is criminal to public welfare and we will try to refrain from usurping its prerogative.

The United States Supreme Court adopted the same approach in *Bowers* and at least four other state appellate courts have acknowledged that the legislature should decide as to the criminalization of consensual sodomy. *State v. Bateman*, 113 Ariz. 107, 547 P.2d 6 (1976); *Carter v. State*, 255 Ark. 225, 500 S.W.2d 368 (1973); *People v. Ragsdale*, 177 Cal.App.2d 676, 2 Cal.Rptr. 640 (1st Dist.1960) and *Critchlow v. State*, 264 Ind. 458, 346 N.E.2d 591 (1976).

Proscribing sodomy is clearly within the legitimate authority of the police power of the state and this Court should not infringe on that authority. Justice Lewis Powell in a concurring opinion in *Zablocki v. Redhail*, 434 U.S. 374, 399, 98 S.Ct. 673, 688, 54 L.Ed.2d 618 (1978) stated that the State represents the collective expression of moral aspirations and has an undeniable interest in insuring that its rules reflect the widely held values of its people. Former U.S. Chief Justice Warren Burger in *Paris Theatre I v. Slaton*, 413 U.S. 49, 59, 93 S.Ct. 2628, 2636, 37 L.Ed.2d 446 (1973), quoting former Chief Justice Earl Warren, *Jacobellis v. Ohio*, 378 U.S. 184, 199, 84 S.Ct. 1676, 1684, 12 L.Ed.2d 793 (1964), said that there is a right of the nation and of the states to maintain a decent society.

Clearly the Court should not usurp the power of the legislature and create or invent fundamental constitutional rights. Such a procedure is not contemplated in any way by the Kentucky Constitution. Any change in the Kentucky sodomy statute must be made the legislature, the duly elected representatives of all the citizens of Kentucky.

It is beyond question that the Kentucky Constitution does not guarantee unlimited privacy in any regard. The state has a rightful concern for the moral welfare of all its citizens and a correct commitment to examining criminal activities wherever they may be committed whether concealed in the home or elsewhere. *Cf. Doe v. Commonwealth Atty. for City of Richmond*, 403 F.Supp. 1199 (E.D.Va.1975) quoting from Justice John Harlan's dissent on other grounds in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

Kentucky's fourth-degree sodomy statute is a valid exercise of legitimate police power by the legislature. The constitutional basis of any statute enacted pursuant to the legislative police power is that it appears that the provisions have some substantial tendency to benefit the public or the general welfare. *Moore v. Northern Kentucky Independent Food Dealers Assn.*, 286 Ky. 24, 149 S.W.2d 755 (1941). The benefit to be derived from the enactment of the statute is primarily a question for determination by the legislature and such determination will not be set aside by the courts unless it manifestly appears to be arbitrary or not based upon substantial grounds. *Moore, supra.*

K.R.S. 510.100 is a constitutionally permissible decision by the Kentucky General Assembly to protect the public and general welfare, it is essentially the kind of statutory enactment that has been recognized by a plurality of the U.S. Supreme Court in *Barnes v. Glen Theatre, Inc.*, 501 U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), in a case involving an Indiana statute prohibiting nude dancing. Justice Antonin Scalia noted in *Barnes, supra*, that our society prohibits certain activities, not because they harm others but because they

are considered in the traditional phrase, *contra bonos mores*, that is, immoral. He notes that in American society such prohibitions have included sadomasochism, cockfighting, bestiality, suicide, drug use, prostitution and sodomy.

The question of public health cannot be ignored in this situation. The contemporary plague of the AIDS virus supports the legitimate exercise of governmental police power by the legislature in banning sodomy. The majority opinion warmly embraces some of the *amicus* briefs, and condones the testimony of the defendant's expert witnesses in an effort to diminish the impact of the curse of AIDS in our society.

Based on data available in 1986, defense witness, Dr. Martin Raff, testified that AIDS is more readily transmitted by homosexual activity than by heterosexual behavior because "anal intercourse tends to abrade the mucosa of the rectum" allowing greater transmittance of the virus. Dr. Raff stated that AIDS is primarily a homosexual disease and that 73 percent of all AIDS patients are homosexuals while drug use and prostitution account for most of the AIDS cases among heterosexuals. Dr. Raff also testified that venereal diseases and parasitic infections are more prevalent among homosexuals than among heterosexuals and that Kentucky, which outlaws homosexual sodomy, has "relatively few cases of AIDS in comparison with other states in the Union."

## II. Equal Protection

We must now turn to the equal protection analysis provided by the majority opinion. Wasson raised this issue in district court but Judge Paisley did not reach the issue. The county attorney pursued the matter on appeal to the circuit court and Judge Tackett decided this question.

The prosecution of the defendant for the criminal solicitation of sodomy does not deny him equal protection of the laws under the Kentucky Constitution. Any analysis of equal protection must include three basic elements. First, is the claimant a member of a distinctive group or recognizable class? If so, does the statute in question treat that class of individuals any differently than it does others? If so, is there a rational basis or legitimate governmental interest in making such a distinction?

Here, the majority opinion fails to correctly analyze the issue. The defendant here has demonstrated only that he belongs to a broader group, to-wit: those persons engaging or wishing to engage in the solicitation of sodomy. Such individuals do not constitute a constitutionally recognizable class because they are not distinguishable from the rest of society by certain immutable characteristics such as race, gender, or national origin. *Cf. Ford v. Seabold*, 841 F.2d 677 (6th Cir.1988). Shared attitudes or preferences of any kind do not establish a recognizable class because they are subject to change. *Cf. Buchanan v. Kentucky*, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).

Secondly, the statute here relates to conduct and not to persons who may choose to label themselves as "homosexuals." Nothing in this record indicates that anyone has identified the defendant as a homosexual. Much of the testimony in the trial court related to presentation by expert witnesses regarding homosexuality. The testimony of Dr. Martin S. Weinberg indicates that persons other than homosexuals engage in sodomy.

Finally, a careful examination of the record in this case indicates there is a reasonable basis for K.R.S. 510.100 because Kentucky's interest in eradicating such behavior is compelling. *Cf. Pfyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

Kentucky has determined that neither a fundamental right nor a suspect class is involved and that the proper test to be applied under the equal protection clause is whether there is a rational basis for different treatment. *Hooks v. Smith*, Ky.App., 781 S.W.2d 522 (1989), citing *Johnson v. Dixon*, Ky., 501 S.W.2d 256 (1973); *Kentucky Milk Marketing and Anti–Monopoly Com'n v. Borden Co.*, Ky., 456 S.W.2d 831 (1970).

The practice of consensual homosexual sodomy is not a fundamentally protected right as specifically determined in the Federal *Bowers* case. Homosexuals are not a suspect class, and consequently, K.R.S. 510.100 is constitutional because Kentucky has a legitimate and rational interest in protecting the health, safety and morality of its citizens. *Bosworth v. City of Lexington*, 277 Ky. 90, 125 S.W.2d 995 (1939).

K.R.S. 510.100 is not subject to strict scrutiny because it does not create a suspect class. It only prohibits acts of homosexual sodomy.

The Supreme Court of Missouri in *State v. Walsh*, 713 S.W.2d 508 (Mo.1986), rejected the argument that a sexual misconduct statute similar to the fourth-degree sodomy statute in Kentucky is subject to strict scrutiny. The Missouri court held that classifications are race, national origin and alienage, but not sexual preference. Missouri has a better reasoned approach to this situation.

K.R.S. 510.100 is not a gender-based statute requiring an intermediate level of scrutiny. Therefore the proper test to be applied under the equal protection clause of the Kentucky Constitution is whether there is a rational basis for different treatment. *Hooks v. Smith*, Ky.App., 781 S.W.2d 522 (1989). The legislature has discretion to determine what is harmful to health, morals and public welfare. *Walters v. Bindner*, Ky., 435 S.W.2d 464 (1968), and there is a presumption of constitutionality of statutes even in cases of reasonable doubt. *Bindner, supra*, at 467.

K.R.S. 510.100 is rationally related to the constitutionally permissible object of permitting and promoting public morality. *See Bowers*, 478 U.S. at 195, 106 S.Ct. at 2846, at 92 L.Ed.2d at 149.

K.R.S. 510.100 is rationally related to a legitimate interest by the state in protecting public health. The defense witness, Dr. Raff testified that in the United States, AIDS is primarily a homosexual disease and 73 percent of all cases are among male homosexuals. Such facts provide a rational basis for distinguishing between act of heterosexual sodomy and acts of homosexual sodomy. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). *Cf. Walsh* at p. 512.

The prosecution of a defendant for criminal solicitation of sodomy in the fourth degree does not deny him equal protection of the law under the Kentucky Constitution.

### III. State Constitutional Law

It would seem that the effect of the majority opinion unwittingly exalts one person's individual rights over the rights of another person. Individual citizens have a right to be left alone, free from public solicitation to engage in sodomy.

The majority opinion totally ignores the practical problems of privacy. If an act is truly private, there is no practical way of enforcing a statute prohibiting it. It is only when another person is involved and then that the entire shallow logic of the majority opinion is shattered. The Mill theory of totally rugged individualism is flawed because "No man is an island." Consensual sodomy by definition involves at least two individuals. It has an impact on other people and clearly has a ripple effect. Almost everything individuals do involves someone else. This is not a contemporary or modern thought, it is ancient and has existed since time immemorial: "Am I my brother's keeper?" The answer was "Yes."

There are real everyday problems involving privacy totally ignored by the majority opinion probably as too mundane. Ordinary citizens are now subject on a daily basis to have their credit files examined, their driving records divulged along with health records, medical records, telephone records and even the records of movies rented at a video store. It is almost impossible for an individual to seek redress for the misuse of certain personal information. These are the real problems of privacy.

What the majority opinion signals is a kind of unwritten consensus constitution,

constantly amendable by judicial discovery in the emanations and penumbras it finds. In this type of operating atmosphere, the real written constitution can be altered and violated very easily.

A great deal has been written about what is claimed to be the recent emergence of state constitutional law. Actually the interest in state constitutional law is simply a return to a recognition of the historical fact that state constitutions exist and function completely independently of the Federal Constitution. That does not mean we can ignore the requirements of the Fourteenth Amendment to the Federal Constitution. Under these circumstances the state and federal courts and the legal systems function as a partnership in the protection of specific constitutional rights. There are two levels of constitutional protection—one federal and one state. However, they are not totally ignorant of each other. Many provisions of the state and federal constitutions are parallel, if not identical. A constitution is the most basic structure of anything, that is how it is constituted. The constitution of a state reflects its basic makeup, the source and delineation and limitation of the rights and powers of any government within that society.

Those who pay great homage to the English common law and its constitutional system sometimes fail to recognize the essential difference between the English and American Constitution is not that the English constitution is unwritten and our Federal constitution is written, actually, it is that the English system is founded on a concept of parliamentary supremacy and the American constitutional theory is that *sovereignty itself* resides in all *the people.* Where the people are sovereign, their conception of their constitution exists apart from, and above, any transient legislative enactments. In a representative democracy, one of the greatest threats to traditional constitutional values arises from passing, but seemingly popular, "progressive" ideas. In the rush to pacify the "squeaking wheels" of special interest groups, long observed legal principles are frequently momentarily abandoned. It is an important function of the court of last resort in

any state to differentiate between passing ideology and permanent value. The most important principle to keep in mind in determining constitutional validity is the will of the people while recognizing the rights of the minority. Equal justice under law must be applied to all citizens, not simply to those who represent a passing special interest who loudly assert their "rights." This is of particular relevance in the application and interpretation of state constitutional law.

An examination of one of the introductory phrases of the majority opinion in *Kentucky Center for the Arts Corp. v. Burns,* Ky., 801 S.W.2d 327 (1990) is very useful in raising the question of who protects the citizens against the overreaching of the Supreme Court. Equal protection of the law extends to all the citizens, not just those who claim a specialized self-ordained label.

Privacy is an issue full of emotion. There is nothing that makes any person angrier than the suspicion that somebody is looking over their shoulder or peering into their private affairs. Every citizen feels vulnerable and ineffectual when our right to privacy is violated. One of the earliest expressions of a Federal right to privacy was by Justice Brandeis in his dissent in *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), when he characterized it as the right to be left alone. Certainly that is an appealing and attractive philosophy. Clearly every individual has an absolute right to be left alone from the public solicitation to engage in sodomy.

Kentucky has already established standards for deciding state constitutional issues in *Rudasill, supra.* The four-part test includes the examination of a text of the constitution; the intent of the drafters; a comparison of the state and federal constitutions and an analysis of prior judicial opinions. These are reasonable guidelines and have not been applied by the majority opinion.

Only the people have the right to decide what are constitutional rights. There is a

mechanism through the amendment of the existing constitution or through the adoption of a new constitution to articulate constitutional rights.

It is neither the right of the legislature, nor of this Court, to exercise arbitrary power over the liberty of free men. Section 3 of the Kentucky Constitution provides in pertinent part that all persons when they form a social compact are equal. Clearly that means those citizens who do not wish to have their privacy invaded by a solicitation to engage in consensual sodomy have significant constitutional rights which have been ignored by the majority opinion in this case.

The majority opinion seeks support from almost every recent opinion of this Court when it cites *Rose, Tabler, Ingram, Dean, Fannin* and *Perkins*, as well as Harvard Professor Tribe. It is a vain solicitation because the majority opinion has ignored the very threshold of the question, that is, the right of the people of Kentucky to regulate their own conduct in societal matters pursuant to a true concept of equal protection of the law for all citizens, including those who are not accused of any crime.

There is no great mystery about the application of the Ninth Amendment to the Federal Constitution. The drafters of the Federal Constitution recognized a fundamental right of all citizens which transcends the mundane legal system. The Federal Constitution recognizes there are certain rights which are retained by the people. Any reasonable analysis of the Tenth Amendment to the Federal Constitution recognizes the congruity of the language and the placement of each amendment. The Tenth Amendment recognizes the rights of the states as distinguished from the fundamental right of the people to perform governmental functions on behalf of the people of the individual states in harmony with the Federal law.

## Conclusion

There is a vast difference between liberty and license. License, in this context, means an excessive undisciplined freedom constituting an abuse of liberty. *See Liberty, Its Use and Abuse*, Ignatius W. Cox, S.J., McMullen Co., N.Y., 1946.

The focus of the majority opinion is fuzzy. It is not clear what the majority opinion has in mind when it refers to a "caring relationship" in the very third sentence of this opinion. Does that mean that the level of private consensual sodomy is subject to continuing judicial review? Is there "caring" incest, suicide, drug use or prostitution? Is each individual circumstance subject to individual case-by-case review?

The entire discussion and rationale of the majority opinion is rooted in legalistic language based in large part on the discredited and irresponsible philosophy of John Stuart Mill. The average person must wonder if the majority opinion means that telemarketers can now invade Kentucky with legal telephone calls to solicit consensual sodomy? What is to prevent it?

It may well be that the people have only one recourse and that is to seek a constitutional amendment to establish what is now the statutory prohibitions against fourth-degree sodomy in the constitutional law of this state.

The majority opinion patently fails the test set out in *Rudasill*, which is the existing law of this State. The majority opinion arbitrarily substitutes its own standards based on turn-of-the-century prohibition cases, the philosophy of Mill and its own interpretation of Kentucky law, and it relies on subjective values of the court majority. It does not adhere to a consistent or neutral standard, but rather invents a shifting case-by-case posture. There is no conviction underlying the many words of the majority opinion.

There must be an understanding that all persons are not alike but all have a right to live peacefully in our society. The judicial system falters if it does not observe such a right.

The judgment of the Fayette Circuit Court should be reversed with directions

that the case be remanded to the Fayette District Court for trial on the merits.

REYNOLDS, J., concurs in the result reached by this dissent.